UNITED ELECTRIC COAL COMPANIES
v. RICE et al.
No. 4655.

District Court, E. D. Illinois.
Dec. 21, 1934.

Rehearing Denied Jan. 22, 1935.

Wm. Acton, of Danville, Ill., and Baker & Lesemann, of East St. Louis, Ill., for plaintiff.

D. W. Johnston, of Taylorville, Ill., P. K. Johnson, of Belleville, Ill., Noble Y. Dowell, of East Peoria, Ill., George W. Dowell, of Du Quoin, Ill., Arthur Fitzgerald, of Springfield, Ill., C. C. Dreman, of Belleville, Ill., and Leal Reece, of Taylorville, Ill., for defendants.

WHAM, District Judge.

By its bill the plaintiff, a nonresident coal mining corporation, seeks an injunction against a large number of individual members and several local unions of District No. 1 of the Progressive Miners of America, and against said District No. 1, enjoining said defendants from interfering with the operation of the plaintiff's strip mine located near Freeburg, St. Clair county, Ill., and from damaging plaintiff's property at said mine by violent and unlawful acts. The bill alleges, and the evidence establishes, facts sufficient to give this court jurisdiction of the case on ground of diversity of citizenship.

No temporary restraining order was sought, and, when the case came on for hearing upon plaintiff's petition for a temporary injunction, after due notice to all the defendants and to the sheriff of St. Clair county, the defendants, after filing and presenting their motion to dismiss, which motion was denied, filed answer, and by stipulation of counsel for all parties final hearing was had upon the bill and answer.

The case is one involving and growing out of a labor dispute within the meaning of the Act of Congress enacted March 23, 1932, commonly referred to as the Norris-La Guardia Act (29 USCA c. 6, § 101 et seq.), hereinafter referred to as the Norris Act, and the jurisdiction of this court to issue an injunction in the suit is defined and limited by the provisions of that law. From the allegations of the bill and the evidence, it would appear that each of the defendants is a person or association participating or interested in a labor dispute as defined in section 13 of the Norris Act (29 USCA § 113), and therefore entitled to the benefits of any defense to this suit that may be found in said law.

While the evidence was voluminous and often sharply conflicting, many of the issues essential to the plaintiff's case seem so clearly established that it will not be necessary to discuss the evidence relating thereto. The evidence shows clearly that plaintiff's Freeburg mine was picketed on different occasions by several thousand pickets consisting principally of the individual defendants and other members of defendant local unions of the Progressive Miners of America, who by their threatening conduct and by many acts of violence, particularly on August 13, September 7, and September 8, 1934, so terrorized and intimidated both miners and managing officers of plaintiff's said mine that they would not try to work in and operate the mine, and made it impossible for the mine to operate without imminent danger of serious violent injury to the persons of plaintiff's employees as well as destruction of plaintiff's property. It is obvious from the evidence that, if the plaintiff attempts again to operate its mine without a settlement of its dispute with the defendants, the same situation will arise. It is further obvious that the sheriff of St. Clair county and his deputies were both unwilling and unable to furnish adequate protection to plaintiff's property, and, although a new sheriff

took office during the trial of this case, he and his deputies are, and will be, unable to afford such protection. It is further apparent from the evidence that, unless restrained, substantial and irreparable injury to plaintiff's property will follow, that plaintiff has no adequate remedy at law, and that greater injury will be inflicted upon the plaintiff by the denial of relief than upon the defendant by the granting of relief.

The evidence not only shows official action on the part of many of the defendant local unions authorizing the said unlawful picketing to be engaged in by all their members, but the solidarity of the movement to the picket line from each of the defendant locals makes inescapable the conclusion that each was a participant as an organization. The unlawful picketing was repeatedly instigated and conducted under the personal leadership of S. L. Jones, an executive board member of the defendant First District of the Progressive Miners of America, and the movement was repeatedly of such magnitude in the number of individual members and local unions participating, accompanied each time with such widespread publicity in the public press, including "The Progressive Miner," the official newspaper of the organization, that a finding that said First District was neither a participant in, nor authorized and ratified, the unlawful picketing, would require the clear inferences arising from the facts and circumstances shown by the evidence to be ignored.

■ Though the facts disclosed by the evidence be as above indicated, this court is without jurisdiction to enjoin the defendants from pursuing their said unlawful conduct, for the reason that the evidence compels two further findings:

First. That the policy followed by plaintiff in dealing with its employees at the Freeburg mine which gave rise to the particular labor dispute here involved has been and is in conflict with the public policy declared in the said Norris Act, in that it has in effect denied to its striking employees at said mine, including many of the defendants in this case, freedom of association, self-organization, and designation of representatives of their own choosing to negotiate the terms and conditions of their employment as well as freedom from interference, restraint, or coercion in the designation of such representatives and in self-organization and in other concerted activities for the purpose of collective bargaining. **29 USCA §§ 101, 102, and 103.**

Second. That the plaintiff has failed to make every reasonable effort to settle the dispute here involved by negotiation. **29 USCA § 108.**

The two findings set forth in the preceding paragraph, depriving this court as they do of jurisdiction to enjoin acts and conduct on the part of the defendants which are not only destructive but legally indefensible, are of such consequence as to demand a somewhat detailed statement of the factual situation shown by the evidence and the applicable principles of law.

The evidence shows that at the time the dispute arose the plaintiff owned and operated the strip coal mine here in question near Freeburg, Ill., another near Du Quoin, Perry county, Ill., another near Cuba, Fulton county, Ill., and other mines at Danville, Vermilion county, Ill.; that plaintiff has at all times employed union labor; that throughout Illinois, for many years preceding August 10, 1932, with minor exceptions not affecting the issues here, the coal-mining industry had been conducted on a closed shop basis under a state-wide contract between the operators, including plaintiff, and the United Mine Workers of America, which was during the period preceding the inception of this dispute the only miners' union, as far as the court is advised, in Illinois; that the 1928 contract with said organization, including the strip-working agreement of February 13, 1927, expired March 31, 1932, and a temporary agreement was entered into on April 4, 1932, between the plaintiff and District 12, United Mine Workers of America; that said District 12 comprised all of Illinois, and all of plaintiff's union employees were members therein; that by the temporary agreement said former contracts were continued in force pending negotiation and ratification of a new state-wide contract; that a new state-wide contract to be effective from August 10, 1932, to March 31, 1933, providing a lower wage scale than formerly, was executed by the officials of the Illinois Coal Operators' Association for the mine owners and operators who were members of that association, including the plaintiff, and by the officials of said District No. 12 and by the president of the International Union, United Mine Workers of America, for the members of the United Mine Workers of America, District No. 12; that on December 22, 1932, a supplemental agreement in writing extending the said contract of August 10, 1932, from March 31, 1933, to and including

March 31, 1935, was similarly executed by the officials of the Operators' Association and said District No. 12; that said contract, as originally executed and as amended and extended, has constituted the working agreement between the members of the Illinois Coal Operators' Association and District No. 12, United Mine Workers of America, since August 10, 1932. Among other provisions, the contract contains the following: "Change Clause 13, paragraph (f) by adding after the word 'right' in its fifth line the following: 'with the understanding that the operators will employ members of the United Mine Workers of America when available, and when in the judgment of the operator the applicant is competent.' "

The evidence further shows that great dissatisfaction immediately arose among the members of the United Mine Workers of America in Illinois over the terms of the said contract of August 10, 1932, and the action of the union officials in executing it, as a result of which on or about September 1, 1932, a new union known as Progressive Miners of America was organized by dissatisfied members of the United Mine Workers, District No. 12, and during the months immediately following a substantial portion of the membership of said District No. 12, including the entire membership of many of its locals, left the old union and joined the new; that 90 per cent. or more of the union miners of St. Clair county, in which county plaintiff's Freeburg mine is located, left the United Mine Workers of America and became affiliated with the Progressive Miners of America; that the plaintiff's employees at the Danville mines retained their membership in the United Mine Workers of America, but the entire membership of the local unions to which plaintiff's employees belonged at the Cuba mine and at the Freeburg mine early in September, 1932, and at the Du Quoin mine on December 28, 1932, left the United Mine Workers and united with the Progressives; that plaintiff's employees at the Freeburg mine had constituted United Mine Workers' Local No. 1763, but by said change became members of Progressive Local No. 47; that the officers of said local, while it was affiliated with the United Mine Workers, continued to hold the same offices after the change without further elections.

The evidence further shows that the members of said Progressive Local Union No. 47 at the Freeburg mine during September and October, 1932, through their local officials and other duly chosen local committees, by written communications and through conferences with representatives of the plaintiff on different occasions, on one of which occasions the local committee was accompanied by S. L. Jones, district board member of District No. 1, Progressive Miners of America, sought to persuade the plaintiff to enter into a working agreement with Progressive Miners of America; that such employees' representatives were consistently informed by plaintiff's representatives that plaintiff had a contract with the United Mine Workers of America which precluded plaintiff from entering into an agreement with the Progressive Miners of America, and plaintiff's representatives consistently refused to deal in any way with the higher officials of the Progressive organization or enter into any agreement with the organization as such; that in the meantime the mine was idle, and both plaintiff and the employees of the mine were desirous of resuming operations; that, after certain conferences between plaintiff and its said employees in October, 1932, the plaintiff, late in that month, resumed and thereafter continued to operate its mine at Freeburg up to March 31, 1933, with the members of Local No. 47 of Progressive Miners of America as employees, during which time the mine paid to that local the union dues by a system of check-off, with knowledge that the local and the members thereof were affiliated with the Progressive Miners of America; that the mine was being so operated on December 22, 1932, when the plaintiff entered into the agreement with the United Mine Workers of America extending the agreement of August 10, 1932, from March 31, 1933, to and including March 31, 1935; that in a like manner plaintiff's mine at Cuba, Ill., on December 22, 1932, was being operated and so continued to August, 1933, with employees who, with plaintiff's knowledge, were members of the Progressive Miners of America.

Witnesses for the defendants testified that in the conferences leading up to the reopening of the Freeburg mine on October 26, 1932, the employees were given to understand that, while the plaintiff, by reason of its contract with the United Mine Workers of America, would make no agreement with the organization, Progressive Miners of America, before March 31, 1933, when the contract of August 10, 1932, would expire, the plaintiff would agree that the members of Progressive Local 47 might work and receive the check-off of the union dues

until March 31, 1933, after which date the plaintiff would be in position to enter into a contract with the Progressive organization. The officials of the plaintiff testified that they at no time stated to or agreed with the representatives of Local 47 that the members of said local would be employed as Progressive Miners up to and including March 31, 1933, under a verbal agreement, and at no time stated that they would consider making an agreement with the Progressive Miners' Union after March 31, 1933. They testified further that the members of Local 47 resumed their employment with the plaintiff in October, 1932, with full knowledge that the plaintiff would not recognize the Progressive Miners' Union; that plaintiff permitted said local to receive the check-off through the same officers who received it while they were members of the United Mine Workers of America.

The evidence further shows that by a letter to the plaintiff, dated March 25, 1933, the officials of said local requested the plaintiff "to sign up with the Progressive Miners' organization in order to continue work after April 1, 1933"; that in March, 1933, the plaintiff received from C. E. Pearcy, president, Progressive Miners of America, the following letter dated March 1, 1933:

"As the Chief District Representative of the labor organization of which your employes at the Cuba, Freeburg & DuQuoin mines are now affiliated with, I take the liberty to invite you into conference for the purpose of negotiating a wage scale to take effect April 1st, '33.

"A Scale Committee composed of representatives selected by the strip pit miners are in readiness to go into discussion and negotiation at any time agreeable.

"We are now in conference with the operators of the shaft mines and if you so see fit would be pleased to meet you in this conference if you have time to attend."

That no response to either of the foregoing communications was made by the plaintiff, and that no negotiations for the purpose of reaching a settlement of the dispute were had or attempted by plaintiff with the officials of the Progressive Miners of America or the representatives of Local 47 after said communications were received by plaintiff.

On March 31, 1933, the employees at the Freeburg mine, after being informed by the superintendent of the mine that the plaintiff would not sign up with the Progressive Miners of America on or after April 1, 1933, but was so bound by its contract with the United Mine Workers of America that it could enter into no contract with the Progressive Miners of America, went out on strike, and the strike has continued until the time of the trial.

The evidence shows that, after the strike on March 31, 1933, the plaintiff took the position, and the members of Local 47 were given to understand, that the mine would not reopen except with employees who were members of the United Mine Workers of America; further, that since then plaintiff has refused, and continues to refuse, to employ any workers at the mine who are not members of the United Mine Workers of America.

The evidence further shows that early in October, 1933, plaintiff received a communication dated October 2, 1933, signed by a committee of three as representatives of Local Union No. 47, as follows: "The undersigned, being the representatives of the membership composing Local Union No. 47, located at Freeburg, Illinois, Progressive Miners of America, hereby demand and request of you as such representatives, the replacement of all of the membership of said Local Union as employees of your Company who are now on strike by reason of your refusal to recognize the Organization and the representatives of the Organization of said employees' own choosing, to-wit: the Progressive Miners of America. In the name of said employees we make this demand and request and hereby notify you that each of said employees is ready and willing to return to his employment with your Company under the terms and conditions of the Bituminous Coal Code as provided for in the National Industrial Recovery Act, approved June 16, 1933"; that plaintiff through its mine manager, George D. Heuff, replied as follows: "In answer to the demands that you and Delmer Smith presented to me, in behalf of Local Union #47, dated Oct. 2, 1933; I have been authorized to state The United Electric Coal Companies has a contract signed for all of its mines with the United Mine Workers of America. Therefore I, personally, advise all of the members of Local No. 47 to rejoin the United Mine Workers of America as soon as possible."

The evidence further shows that in October, 1933, four or five members of said Progressive Local 47 signed a petition prepared at the mine office by officials of the United Mine Workers of America which read as follows: "We, the undersigned men,

former members of Local No. 1763 desire to become members of the United Mine Workers of America, as there is a chance to start the United Electric Coal Companies' strip mine located south of Freeburg, Illinois"; that, accompanied by George D. Heuff, plaintiff's manager of the Freeburg mine, the men who had signed the petition carried it to other members of said local; that a total of twenty-seven names of such members were secured on the petition; that the men to whom the petition was presented were subjected to coercion and duress by being informed, in effect, that the only way they could hope to resume their former jobs in the mine was for them to become members of United Mine Workers of America; that this statement was confirmed whenever necessary by the mine manager; that a provisional local of United Mine Workers of America was established at the mine, but it does not appear how many of those who signed said petition actually joined said local; that plaintiff's intention to reopen the mine with United Mine Workers in October, 1933, was not carried out by reason of failure to receive assurance from the sheriff of St. Clair county that the mine would be protected if operations were resumed with United Mine Workers as employees; that on October 19, 1933, the mine was picketed by several hundred Progressive miners, including many of defendants, on the rumor that the mine would resume operations on that day with United Mine Workers as employees.

The evidence further shows information became current that the mine would be reopened with United Mine Workers as employees on August 13, 1934; that, though the information proved to be false, the mine was picketed on that day by many hundreds of Progressive miners; that early in September, 1934, plaintiff, having secretly planned to reopen the mine with United Mine Workers, sent a letter to all of its former employees on September 6 informing them that the mine would reopen on September 7, and did resume operations, using only employees who were or made application to become members of United Mine Workers of America; that the mine worked throughout that day, and intended to continue thereafter, but was prevented by unlawful mass picketing on September 8 by two or three thousand Progressive miners, and the mine has not worked since; that of the union employees who worked at the mine on September 7 and 8, 1934, as United Mine Workers, something like fourteen had been employees at the mine when it closed on March 31, 1933; that the others had not worked at the mine before; that some of them were boys and young men without any mining experience; that some were not members of any union, but made application on the job to become members of United Mine Workers of America.

The evidence further shows that this dispute was taken before the Bituminous Coal Labor Board, Division II, on petition of representatives of the United Mine Workers of America, which made the plaintiff and the Progressive Miners of America parties, setting up their claimed rights under the contract between the plaintiff and the United Mine Workers of America and complaining of the attempts of the Progressive Miners of America to force recognition of that organization by the plaintiff through intimidation and picketing the mine at Freeburg thereby preventing its operation. The entire controversy was presented at a hearing before said Board on February 9, 1934, resulting in findings and a holding which is set forth in the margin:[1]

[1] "The Board finds that a contract between the United Mine Workers of America and the United Electric Coal Company was entered into in August, 1932, and was extended on December 22, 1932, to April 1, 1935; that the Progessive Miners of America were in the majority when the mine was opened in October, 1933; that the company recognized the Pit Committee of the Progressive Miners of America; that this condition continued until April 1st, 1933; that at that time the company announced that it would operate under the United Mine Workers contract and that all employees must be members of the United Mine Workers of America.

"The Board finds that the company never entered into a contract with the Progressive Miners of America and such informal arrangements as it had with the Progressive Miners of America did not constitute a recognition of that body nor did it cause an abrogation of the contract with the United Mine Workers of America.

"The Board holds, therefore, in conformity with its decision in the Peabody case that the contract between the United Electric Coal Company and the United Mine Workers of America is in force for the purpose of collective bargaining in this mine."

Section 8 of the Norris Act (29 USCA § 108) reads: "No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

Plaintiff contends earnestly that it has done all that the section just quoted requires; that the submission of the dispute to said Bituminous Coal Labor Board and its compliance with the Board's holding was a performance of "any obligation imposed by law which is involved in the labor dispute in question," and constituted reasonable effort to settle the dispute with the aid of the only available governmental machinery of mediation; that the holding of the said Labor Board that plaintiff's contract with the United Mine Workers is valid under the National Industrial Recovery Act (15 USCA § 701 et seq.) and is in force for the purpose of collective bargaining at the Freeburg mine compels plaintiff to perform its obligations under the contract or be subject to penalties under the National Industrial Recovery Act; that by the terms of said contract it cannot enter into any agreement with Progressive Miners of America or employ its members; that the offers of the representatives of that organization and of said Local 47 to negotiate were based at all times on the condition that plaintiff recognize and enter into a contract with the Progressive Miners of America as an organization which plaintiff could not lawfully do in view of its contract with United Mine Workers of America, wherefore settlement of the dispute by negotiation was impossible and therefore not required.

■■ After giving the matter much thought, I am unable to agree that plaintiff has complied with the letter or the spirit of section 8 of the Norris Act (29 USCA § 108). It made no substantial effort to settle the real dispute by negotiation before or after the mine closed on March 31, 1933, or before or since the passage of the National Industrial Recovery Act (June 16, 1933, 15 USCA §§ 701–712), under which the Bituminous Coal Labor Board was created. That tribunal, it seems to me, can in no sense be said to constitute governmental machinery of mediation or voluntary arbitration within the meaning of said section

8, but is a body set up under the Bituminous Coal Code to investigate, hear, and determine controversies after all reasonable efforts toward settlement through arbitration and mediation have failed. Code of Fair Competition for the Bituminous Coal Industry, art. 7, § 5. Plaintiff made no effort at mediation or arbitration before said hearing. In fact, the plaintiff did not initiate the proceedings before the Bituminous Coal Labor Board, but were brought into that hearing by the United Mine Workers of America. Such being the fact, and since the Bituminous Coal Labor Board cannot be classified as governmental machinery of mediation or voluntary arbitration within the meaning of those terms as used in said section 8, plaintiff's enforced appearance before it in the hearing mentioned could fort on plaintiff's part to settle the dispute scarcely be held to be such a reasonable effort on plaintiff's part to settle the dispute with the aid of available governmental machinery of mediation or voluntary arbitration as would relieve the plaintiff from its duty under said section 8, to make reasonable effort to settle such dispute by negotiation in order to bring itself within the jurisdictional power of this court to issue an injunction in a suit of this character.

■■ Neither am I convinced that the possibility of settling the dispute through negotiation was so hopeless as to relieve the plaintiff from making reasonable effort to that end, even when plaintiff's obligation under its contract with the United Mine Workers is considered. As was stated by plaintiff's counsel during the trial and in the argument, the plaintiff was justified in its employment of Progressive miners at its mine at Cuba from some time in the autumn of 1932 until August, 1933, and at its mine at Du Quoin from January, 1933, through several succeeding months and at Freeburg from October, 1932, to March, 1933, under the clause of its contract which bound it to employ United Mine Workers exclusively only "when available, and when in the judgment of the operator the applicant is competent." The evidence shows that United Mine Workers were not available during those periods, and further shows that the conditions at the Freeburg mine had not changed in this respect on March 31, 1933, nor had they changed even up to the time of the trial so as to demonstrate that reasonable efforts to negotiate the dispute would prove entirely useless. It is true that some of plaintiff's employees have re-en-

tered, and some others have considered re-entering, the ranks of the United Mine Workers, though mainly, it would appear, through the pressure of economic necessity of getting employment, whatever the conditions imposed, rather than through choice. All of plaintiff's employees at the Freeburg mine on March 31, 1933, as well as practically all of the miners in St. Clair county, were, and continued to be, members of the Progressive Miners of America. It does not appear from the evidence that at any time since March 31, 1933, have competent members of the United Mine Workers in sufficient numbers to operate the mine and who became such of their own choice been available in the natural territory from which the employees of the mine have been drawn in the past. In view of the foregoing facts, and without having tried it, can plaintiff now say that a reasonable effort to settle the dispute through negotiation would not have resulted in some arrangement that plaintiff could legally have entered into without violating its contract with the United Mine Workers of America? It is true that plaintiff's employees made no concrete offer of negotiations on any other basis than that the plaintiff recognize and make a contract with Progressive Miners of America, and their demands were of that nature. However, if plaintiff could not, or believed it could not, accede to such demands, even as to the mine at Freeburg, this did not relieve it of the duty to negotiate. The purpose of negotiation, and often the result, is to obtain modification of demands. There is nothing in the letter of President Pearcy quoted above that would indicate an impossibility of results through negotiation or that would justify an ignoring of the invitation contained therein if plaintiff expected thereafter to seek an injunction under the terms of the Norris Act. It would appear quite probable that through discussion with representatives of its employees the plaintiff could have reopened the mine under the same arrangement that prevailed from October, 1932, to March 31, 1933, or some other amicable arrangement.

■ I am of the opinion that the findings and holding of the Bituminous Coal Labor Board have not affected the necessity for a showing by the plaintiff in this case that it has met every condition made requisite by the Norris Act (29 USCA §§ 101–115) to the jurisdiction and authority of this court to issue an injunction, including the requirement of a reasonable effort to settle the dispute by negotiation. In like manner I am convinced that said findings and holding, under the facts in this case, in no way modify the specific prohibition contained in section 1 of said act (29 USCA § 101) against the issuance of an injunction contrary to the public policy declared in the act. I base the foregoing conclusions upon the premise that the Bituminous Coal Labor Board is wholly without power or jurisdiction to fix and declare legally enforceable rights between the plaintiff and its employees who are engaged in mining coal at the Freeburg mine, which is an employment wholly intrastate in character. A further consideration in support of said conclusions is that the mere holding of said Bituminous Coal Labor Board that the said contract is valid and in force for the purpose of collective bargaining in the mine in question in no way changes the terms or meaning of the contract itself and places the plaintiff under no obligation to employ only members of United Mine Workers of America where such members are not available. Nor does such holding justify an interpretation of the contract whereby the plaintiff and the officials of United Mine Workers of America may co-operate to make members of that organization available through pressure upon plaintiff's employees who were members of Progressive Miners of America to leave that organization and join the United Mine Workers of America.

■ I am convinced also that the contract relied upon by the plaintiff to justify its asserted right and obligation to employ only members of United Mine Workers of America at its mine in Freeburg, if interpreted to impose such a contractual obligation on the plaintiff, was, when entered into on December 22, 1932, under the conditions existing on that date, in so far as it affected the rights of the employees at the Freeburg mine who were not parties to the contract, contrary to the public policy declared in the Norris Act § 2 (29 USCA § 102), and has continued to be so. In said declaration of public policy, it is said that it is necessary that the worker have "full freedom of association, self-organization, and designation of representatives of his own choosing to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." When plaintiff's employees at the Freeburg

mine were all known to the plaintiff to be members of the Progressive Miners of America on December 22, 1932, a contract on that date by the plaintiff with the United Mine Workers by which plaintiff bound itself to employ only members of the United Mine Workers which, in effect, bound plaintiff to discharge its said employees or retain them only upon condition that they give up the organization and representatives of their choice and unite with the organization chosen for them by their employers, cannot be in keeping with the public policy above expressed. Though the contract may be strictly legal, even as interpreted by plaintiff, so interpreted, it was on December 22, 1932, and has since continued to be, in my opinion, opposed to said public policy, and the issuance of an injunction in its support would be contrary to said public policy. Sections 1, 2, and 3, Norris Act (15 USCA §§ 101, 102, and 103).

The contention of counsel for plaintiff that its contract with the United Mine Workers of America is simply a closed shop agreement such as has always been held to be valid and never thought to be contrary to the public policy declared in the Norris Act would be convincing had the employees of the plaintiff at all of its different mines, including the Freeburg mine, been attached to the United Mine Workers of America at the time the contract was made on December 22, 1932. The evidence shows, however, that all of its employees at the Freeburg mine and at the Cuba mine were then members of the Progressive Miners of America. Surely a closed shop agreement with the United Mine Workers of America under those conditions, embracing all of plaintiff's widely separated mines alike and disregarding the allegiances of the miners at part of the mines, was contrary to the public policy declared in said law. Nor am I willing to accept the contention of counsel that such a contract should be held to be within said public policy by reason of the fact that a majority of the total number of plaintiff's employees at all of its mines were, on December 22, 1932, members of United Mine Workers of America. Conceding the fact, and it seems to be established by the evidence, I cannot believe that the public policy as expressed in the words quoted above admits of a construction which would compel the employees at one mine of an employer to give up their chosen organization and representatives just because a greater number of employees at other distant mines have

chosen for themselves another organization and other representatives.

For the reasons stated, I reach the conclusion that plaintiff's prayer for injunction must be denied, and its bill dismissed, with costs. Decree in accordance with foregoing will be filed this day.