## UNITED ELECTRIC COAL COMPANIES v. RICE et al. *

### No. 5479.

Circuit Court of Appeals, Seventh Circuit.
Oct. 26, 1935.

Rehearing Denied Dec. 10, 1935.

*Certiorari denied 56 S. Ct. 590. 80 L. Ed. —.

William M. Acton, of Danville, Ill., and Ralph F. Lesemann, of East St. Louis, Ill., for appellant.

A. M. Fitzgerald, of Springfield, Ill., George W. Dowell, of Duquoin, Ill., Nobel Y. Dowell, of East Peoria, Ill., and C. C. Dreman, of Belleville, Ill., for appellees.

G. L. Grant, of Springfield, Ill., Thurlow G. Lewis, of Benton, Ill., and Henry Warrum, of Indianapolis, Ind., for United Mine Workers of America as amicus curiæ.

Before EVANS, SPARKS, and ALSCHULER, Circuit Judges.

EVANS, Circuit Judge.

Appellant, a Delaware corporation, owns and operates several coal mines in Illinois. Among them is a strip mine, near Freeburg in the County of St. Clair. Appellees are for the most part miners, former employees of appellant in the Freeburg mine. They are residents of Illinois. Appellee, First District of the Progressive Miners of America, is a voluntary, unincorporated association, composed entirely of individuals who are residents of Illinois and primarily engaged in mining coal. The other local unions, also made parties to this suit, are divisions of the Progressive Miners of America, which operate in various southern Illinois counties.

The District Court denied appellant the injunctive relief which it sought against appellees, who were charged with having wilfully and forcibly prevented the operation of the mine at Freeburg and with having damaged appellant's property and interfered with the conduct of its business.

The court found the material allegations of the complaint in appellant's favor, but denied relief because of section 8 and the public policy sections 1, 2, and 3 of the Norris-La Guardia Act (29 USCA §§ 108, 101–103). The findings cover twenty-one pages of the transcript and are too long to be here set forth in their entirety.

The real controversy is one between two unions,—The United Mine Workers of America, hereinafter called the United; and the Progressive Miners of America, hereinafter called the Progressive. It is a bitter contest. For over two years it has been fought by the officers of these two unions. Neither group has been willing to compromise. Appellant is the innocent bystander, a victim of this unabated conflict. Appellant has no dispute with its employees. The wage scales in force apparently were satisfactory to employer and employee alike. The working conditions brought no discontent. The employees were desirous of working for appellant. With them appellant wished to operate its mine. This has been prevented by the struggle between the two unions over who should represent the employees.

The focus of the conflict, the Freeburg mine, is one of several owned and operated by appellant. Over a period of many years, appellant was under contract with United to employ only United men in its several mines unless such union employees were not available. In March, 1928, such a contract (which ran four years) was again entered into. There was then no coal miners' union other than the United. The Progressive, however, came into existence shortly after this contract expired. It sought to oust the United. It demanded recognition as the representative of the local union with which appellant must contract. United disputed Progressive's right to so speak. To secure recognition, Progressive called its members from appellant's employment. When appellant sought, on several occasions, to open its mine with men who refused to strike, the Progressive picketed the property and resorted to violence. Appellant was thereby forced to suspend operations.

We take the following fact statement from the findings of the District Court. The Freeburg property consisted of about 700 acres (owned or controlled) and it an-

3

nually produced over 300,000 tons of coal. It was forced to shut down by appellees. Since March 31, 1933, the mine has operated only one day. Its damages were fixed at $350,000 up to the time of trial.

Wages and employment conditions are the subject of contract between operators and miners. The operators have their association and the miners, their union. Representatives of these two organizations meet, and the contract they enter into is binding upon them throughout the State of Illinois after the miners have approved of it. Such a contract was made March 31, 1928, and expired March 31, 1932. During this period there was but one union, and the operators spoke through their representative. When the contract was about to expire, negotiations were conducted by the officers of the two organizations, and on April 1, 1932, an agreement was reached whereby the 1928 contract was continued in force until same was terminated upon thirty days' notice or until a statewide agreement was ratified. Shortly thereafter a state-wide agreement was executed and became effective August 10, 1932, and continued until March 31, 1933. It was over the ratification of this agreement that differences arose among the miners. Ballots were stolen and counts thwarted. The officers then declared or attempted to declare the contract in force. This contract was quite similar to the preceding one and contained the same provisions respecting the employment of members of the United. It was about this time that a large number of Illinois members of the United became dissatisfied and terminated their membership in United, and organized the Progressive. This union divided the state into locals, and the mine in question was in the jurisdiction of local No. 47. Operation of the Progressive in this district was under control of one Jones. The contest for membership and control of more laborers by the two unions was extremely bitter from the start. The character of the warfare is described in the opinion written in People v. Beacham, 358 Ill. 373, 193 N. E. 205.

In September, 1932, the majority of the local union at Freeburg voted to join the Progressive. They did not, however, surrender their charter granted by the United. The same officers continued. Thereafter the war became more bitter. A demand was made upon appellant to sign a working contract with the Progressive. Pickets closed the mine. On the evening of October 18, appellant and officers of the local Progressive made arrangements whereby the men returned to work and the pay-off check was made payable to the officers of the union without designating the name of the union. The mine continued to operate under such arrangement without interruption until April, 1933, when the Progressives demanded that the appellant abrogate its contract with the United and enter into a similar one with the Progressive. This demand was refused, and, on March 31, 1933, the president of the Progressive local informed the superintendent that all operations would cease at midnight, since which time the mine has been closed, save for one day. Disorder and destruction of property have followed, and when attempts were made to open the mine, the opposition evidenced by 2500 men, more or less effectively armed, threatened the miners who resumed employment with violence and even with death.

A few employees who had rejoined the United and who sought to go to work, but were not permitted to do so, filed a complaint before the Bituminous Coal Labor Board. Appellant and Progressive were both made parties. A hearing was had with all parties represented by counsel. The Board held: "That the contract between United Electric Coal Company and the United Mine Workers of America is in force for the purpose of collective bargaining in this mine." It further directed that its decision should be in force for the period of six months.

The Progressive refused to accept or adopt this decision and refused to allow the mine to open. The sheriff and other local officers declined to act or to protect appellant's property. The District Court stated:

" * * * It is further obvious that the sheriff of St. Clair County and his deputies were *both unwilling and unable* to furnish adequate protection to plaintiff's property, and, although a new sheriff took office during the trial of this case, he and his deputies are and will be unable to afford such protection." 9 F. Supp. 635, 636.

Violence at the mine by members of the Progressive and their sympathizers grew. A majority of the miners working in the mine signed a petition asking appellant to resume operation. In securing the

signatures representatives of appellant accompanied the employees and stated that it was the only way that the employees could hope to resume work.

The District Court stated that the men to whom the petition (which asked appellant to reopen the mine) was presented, "were subjected to coercion and duress *by being informed, in effect,* that the only way they could hope to resume their former jobs in the mine was for them to become members of United Mine Workers of America; that this statement was confirmed whenever necessary by the mine manager; * * * it does not appear how many of those who signed said petition actually joined said local * * *."

In disposing of the case the court also said:

"* * * The evidence compels two further findings:

"First. That the policy followed by plaintiff in dealing with its employees at the Freeburg mine which gave rise to the particular labor dispute here involved has been and· is in conflict with the public policy declared in the said Norris Act in that it has in effect denied to its striking employees at said mine, including many of the defendants in this case, freedom of association, self-organization, and designation of representatives of their own choosing to negotiate the terms and conditions of their employment as well as freedom from interference, restraint, or coercion in the designation of such representatives and in self-organization and in other concerted activities for the·purpose of collective bargaining. 29 USCA §§ 101, 102 and 103.

"Second. That the plaintiff has failed to make every reasonable effort to settle the dispute here involved by negotiation. 29 USCA § 108."

The significance of these two findings is disclosed by the court's observation:

"The two findings set forth in the preceding paragraph, depriving this court as they do of jurisdiction to enjoin acts and ·conduct on the part of the defendants which are not only destructive but legally indefensible, are of such consequence as to demand a somewhat detailed statement· of the factual situation shown by the evidence and the applicable principles of law."

The District Court has stated its views in support of the conclusions reached, and they might well be set forth in full because of their clarity if a due regard for the length of this opinion did not forbid.

The statutes involved are set forth in the margin.*

---

* "§ 102. *Public policy in labor matters declared.* In the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are herein defined and limited, the public policy of the United States is hereby declared as follows:

·"Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms ·and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the ·interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are hereby enacted. (Mar. 23, 1932, c. 90, § 2, 47 Stat. 70.)

"§ 103. *Nonenforceability of undertakings in conflict with public policy; 'yellow dog' contracts.* Any undertaking or promise, such as is described in this section, or any other undertaking or promise in conflict with the public policy declared in section 102 of this chapter, is hereby declared to be contrary to the public policy of the United States, shall not be enforceable in any court of the United States, and shall not afford any basis for the granting of legal or equitable relief by any such court, including specifically the following:

"Every undertaking or promise hereafter made, whether written or oral, express or implied, constituting or contained in any contract or agreement of hiring or employment between any individual, firm, company, association, or corporation, and any employee or prospective employee of the same, whereby

"(a) Either party to such contract or

To reverse the decree appellant argues:

(1) That section 108, 29 USCA—the Norris-La Guardia Act, § 8—limiting the power of a Federal court of equity to restrain threatened injuries to property, is unconstitutional.

(2) If said Act be constitutional, it is not applicable to the facts in the instant case because (a) the controversy does not involve a labor dispute, (b) the Act does not apply where injunctions are sought to prevent injury to property, (c) if a labor dispute is involved and section 108 be construed as appellees contend, then the evidence shows appellant used "reasonable effort to settle such dispute" and that it did not fail to comply with all obligations imposed upon it by law with respect to labor disputes.

(1) Inasmuch as Congress may take from, as well as confer upon, inferior Federal courts jurisdiction of cases which involve controversies between citizens of different states (Kline v. Burke Construction Co., 260 U. S. 226, 43 S. Ct. 79, 67 L. Ed. 226, 24 A. L. R. 1077; Ex parte Robinson, 19 Wall. 505, 510, 22 L. Ed. 205; Bessette v. W. B. Conkey Co., 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997; Sheldon v. Sill, 8 How. [49 U. S.] 441, 449, 12 L. Ed. 1147; Levering & Garrigues Co. v. Morrin [C. C. A.] 71 F.(2d) 284), we find no support for a conclusion which would deny validity of this legislation.†

The legislation in question took from District Courts, jurisdiction of causes involving labor dispute injunction suits between citizens of different states, in certain limited instances, and was within the power of Congress conferred by article 3, sections 1 and 2 of the United States Constitution.

(2) Do the facts present a case "growing out of a labor dispute" or which is "involved in a labor dispute," as those two phrases are used in the Act?

Looking to the purpose, as well as to the words, of the Act, we are satisfied that the term "labor dispute" should be most broadly and liberally construed. The term "labor disputes" comprehends disputes growing out of labor relations. It infers employment—implies the existence of the relation of employer and employee. Disputes between these parties are the general subject matter of this legislation. All such disputes seem to be clearly included.

Equally clear we think must be the conclusion that the dispute referred to in the statute *must* be one between the employer and the employee or growing directly out of their relationship. It does not apply to disputes between employees or to disputes between employee unions to which employer is not a real party. The employer is not precluded from invoking the jurisdiction of a Federal court of equity unless it appears that it was in some way a party to the dispute, between two unions.

Confirmation of this conclusion may be found in the other sections of the Act which clearly indicate that the entire Act had reference to controversies over wages and conditions of employment which arise between employer and employee and result in strikes or threatened strikes which work hardships upon the innocent third party—the public.

In seeking to avoid strikes, it was to be expected that arbitration would be encouraged and resort to court proceeding discouraged. It is quite apparent that the employer has nothing to arbitrate and no use for conciliators when it and its em-

---

agreement undertakes or promises not to join, become, or remain a member of any labor organization or of any employer organization; or

"(b) Either party to such contract or agreement undertakes or promises that he will withdraw from an employment relation in the event that he joins, becomes, or remains a member of any labor organization or of any employer organization. (Mar. 23, 1932, c. 90, § 3, 47 Stat. 70.)"

(Section 108, 29 USCA) "*Noncompliance with obligations involved in labor disputes or failure to settle by negotiation or arbitration as preventing injunctive relief.* No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration. (Mar. 23, 1932, c. 90, § 8, 47 Stat. 72.)"

† Toledo Fence & Post Co. v. Lyons (C. C. A.) 290 F. 637; Hallowell v. Commons, 239 U. S. 506, 36 S. Ct. 202, 60 L. Ed. 409. See, also, Michaelson v. United States (C. C. A.) 291 F. 940; Id., 266 U. S. 42, 45 S. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451.

ployees are in accord. It is hard to see what sort of arbitration or conciliation was intended if the legislation referred to anything other than to strained or striking relationships between employer and employee over wages and conditions of employment. Where the difference is between two unions, each striving to contract with the employer, and there is no controversy as to terms of employment with said employer, we are unable to see where any labor dispute exists to which the employer is a party.

Of course, there may be a seeming controversy between two unions which is in reality merely a labor dispute between the employer and employees. Such a situation falls within the meaning of the term "labor dispute." The employer may not avoid inclusion in a labor dispute if he participates in union activity which directly or indirectly influences or affects employment relations.

Subsection (c) of section 113, 29 USCA defines labor dispute as follows:

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

There was no *controversy* between appellant and appellees on any subject. Appellant's employees could join any union they wished. They could change membership in one union for that of another. They could quit work, individually or collectively. But they cannot assert they have a controversy with appellant because of the existence or exercise of such rights. They could not, with no controversy with appellant at stake, change membership in unions and then demand of appellant that it break a valid contract which it had with another union and call it a controversy.

There is no evidence which would justify us in assuming that appellant, through the United, was seeking to change the labor contract with its employees. The record shows that the terms of the contract were not in dispute. The Progressives were willing to sign the same contract which had been made for them by their previous representative, the United. We cannot escape the conclusion, therefore, that the facts in this case present no labor controversy between appellant and the mine workers. On the other hand, it clearly appears that the controversy was between two unions; that appellant was not a participant therein and was interested only because it had made a contract with one union when that union represented all of its employees including most of appellees.

Did the appellant fail to make every reasonable effort to settle the dispute either by mediation or voluntary arbitration, as required by section 108, assuming the controversy to be a labor dispute?

The findings of the District Court on this issue are against the appellant. It is sufficient to say that the evidence strongly if not conclusively establishes the following facts. Appellant dealt with the United when the United represented all of the miners in the United States. Among the union miners who were thus affected were appellees—the employees of appellant. The contract thus negotiated was continued in force by mutual consent of the parties for a new months after its expiration. In making a new contract, an association of operators represented appellant and the United represented the miners, including those working at the Freeburg mine. A new contract was negotiated between the United and representatives of appellant. This was in August, 1932. At this time there was no question but that United represented appellant's employees. It was after this contract was entered into and in the month of September, 1932, that individual members of United working for appellant joined the Progressive.

It was largely through appellant's peace negotiations that arrangements were made whereby its employees (appellees) continued to work, although they were members of the Progressive. This was accomplished by appellant's making the pay-off checks to an individual without identifying his union affiliation. This continued until April, 1933. In no respect did appellant fail thus far in its attempt to continue the employer-employee relationship. It was willing, indeed anxious, to continue this relationship. It was at this time and place that appellees insisted that appellant should break its contract with United. Appellees, not appellant, terminated the employer-employee relationship. It was terminated without any controversy or dispute be-

tween them as to wages or conditions of employment.

Thereafter repeated efforts were made to get the parties back at work and the mine opened. To accomplish this result certain employees sought the aid of a third party. The B. C. L. Board was petitioned for help. Again appellant was a neutral party at this hearing. It appeared and acquiesced in the Board's jurisdiction. It was willing to abide by its decision. At this time the validity of said Board's existence had not been successfully challenged. It was generally recognized as a neutral, impartial, outside body, not unfriendly to labor or labor unions and was created for the purpose of conciliating differences between employer and employee or among employee unions and to avoid strikes and to terminate strikes. It is fair to assume that all parties were acting in good faith in appearing before this Board. Progressive however refused to abide by its decision.

In determining whether appellant made "every reasonable effort to settle the dispute" it may be conceded that the ruling of said Board was not binding upon any of the parties and that appellees might legally repudiate its decision. Submission, however, to it on appellant's part was some evidence of good faith, as well as of an honest effort to peaceably induce its employees to return to work.

From this time on there was nothing upon which appellant could compromise or arbitrate. Not only was its contract with the United binding upon it, but even if there existed no contract it had an absolute right to make a contract with United. There is not a scintilla of evidence to justify the conclusion that the United was the appellant's—an employer-union.

However, negotiations continued to the day of the trial. When the case was on for trial appellant's president met the general counsel for appellees and the latter pronounced an ultimatum to the effect that appellant "would not be permitted to operate said mine upon any condition except under a contract with Progressive."

Just what appellant was further expected to do in the face of this pronouncement has not been suggested. Demand that one party break its valid contract and concede away its right to contract with its employees was not within the field of possible compromise. Had it broken its con-

tract with United, it would not only have invited a strike by United at other mines, but a suit for damages and an injunction as well.

The desire to arbitrate disputes—to iron out differences with employees—is highly commendable. But it is a misnomer to designate, as an offer to arbitrate, a demand to break a contract with a third party against said party's objection and to surrender one's right to employ individuals because they happen to belong to a union—a bona fide employees' union—other than that to which the demander belongs. Such a demand permanently closed the door of mediation. It was a demand for an unconditional surrender. Its acceptance was as impossible as the demand was arrogant. If taken as expressive of appellees' only terms of negotiation, it closed the door to further conciliation or arbitration.

The court concluded that appellant had not made "every reasonable effort" to settle the dispute because it did not meet the officers of the Progressive after receiving the communication bearing date of October 2, 1933, which reads as follows:

"The undersigned, being the representative of the membership composing Local Union No. 47, located at Freeburg, Illinois, Progressive Miners of America, hereby demand and request of you as such representatives, the replacement of all of the membership of said Local Union as employees of your Company who are now on strike by reason of your refusal to recognize the Organization and the representatives of the Organization of said employees' own choosing, to-wit: the Progressive Miners of America. In the name of said employees we make this demand and request and hereby notify you that each of said employees is ready and willing to return to his employment with your Company under the terms and conditions of the Bituminous Coal Code as provided for in the National Industrial Recovery Act, approved June 16, 1933."

This demand by the Progressives was not unlike the ultimatum which appellees' counsel issued to appellant's president. Regarding it the District Court observed that if appellant " * * * could not, or believed it could not, accede to such demands, * * * this did not relieve it of the duty to negotiate. The purpose of negotiation and often the result, is to obtain modification of demands."

This conclusion, however, does violence to the terms of appellees' demand. The parties had been haggling over this single issue for more than a year. Appellees were not negotiating or trying to settle a difference with appellant. They were striking at a rival union, the United, through appellant. The blow was aimed at United, but it hit appellant, an innocent third party.

Appellees' position as stated in their demand was not that they were willing to compromise or negotiate with appellant, but they consistently and defiantly asserted that members of the United must not be employed. They had not only made such pronouncement before, but in violation of the law of Illinois, as well as the Federal government, and in destructive defiance of the rights of appellant, they had intimidated the local authorities and threatened death to those who sought to operate the mine without becoming Progressives.

█ Our conclusion is that the finding that appellant failed to make reasonable efforts to settle the dispute is not supported by the evidence.

Another contention which goes to the merits of this case, even upon appellees' construction of the statute, involves the meaning and application of section 108. Appellant contends that it was entitled to enter a Federal court of equity and seek an injunction to protect its property against *wilful* acts of trespass, as well as against acts of violence, committed by its employees during a strike regardless of the stage of the peace negotiations. To support its views appellant cites the Congressional Reports leading up to the passage of the Act. The Act is called the Norris-La Guardia Act. Senator Norris was one of its sponsors. It was intended as he said to abolish "yellow dog" contracts. The question of its scope was naturally a matter of vital importance. In its report in the Senate, the committee said:

"It is not sought by this bill to take away from the judicial power any jurisdiction to restrain by injunctive process unlawful acts, or acts of fraud or violence."

In explaining its terms and their limitations, the sponsors said before the House:

"Gentlemen, this bill does not—and I cannot repeat it too many times—this bill does not prevent the court from restraining any unlawful act. * * *"

"Contrary to the belief of some people, this bill does not attempt to take away from the Federal courts all power to restrain unlawful acts or acts of fraud or violence in labor disputes."

"The public is amply protected as the bill is now drawn. It is a mistaken notion that some have that all injunctions are proscribed. There still is left to the Federal courts the right to issue injunctions when there are unlawful acts threatened or committed, when substantial and irreparable injury to complainant's property is done—and when there is no adequate remedy at law in all those cases, the Federal courts will still have the right to issue injunctions. When there is fraud, when there is violence, and when there is crime injunctions may issue. When any of those things are threatened or committed injunctions may ensue."

The intention of Congress was thus clearly expressed. It was evidently not intended to take from courts of equity, jurisdiction of suits to restrain *unlawful* acts or acts of *violence*.

Appellees, however, argue that although such may have been the intention of Congress it unfortunately did not express its intention and its enactment actually withdrew from the Federal courts all jurisdiction to grant injunctions in all cases growing out of labor disputes.

The premise to appellees' argument cannot be gainsaid. Cases without number may be cited which hold committee reports, congressional debates, etc., will not be considered where the words of the statute are unambiguous and their meaning clear. Standard Fashion Co. v. Magrane-Houston Co., 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653; United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 53 S. Ct. 42, 77 L. Ed. 175; Caminetti v. United States, 242 U. S. 470, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196.

█ There seemingly is no canon of statutory construction better settled than the one which forbids reference to Congressional Records or to statements of legislators except in cases where the language of the statute is doubtful, uncertain or ambiguous. Such references may never be

used to create doubt. 25 Ruling Case Law, pp. 1037, 1038.

██ It is difficult for us to assume that the section is free from doubt in view of the positive statements of its sponsors to the contrary. In fact, it is argued by appellant that appellees have not been able to create a doubt as to the unsoundness of the position by them taken. In other words the parties are hopelessly at variance over the breadth of the construction of the words of section 108. It appears to us that the doubt is not over the meaning of the words, but of their applicability and Senator Norris's statement as to the nonapplicability of the section to *acts of fraud* and *violence* should be considered, and when considered they exclude from the scope of section 108 acts of fraud and acts of violence which destroy or damage the employer's property.

Every reason would seem to support the position taken by the sponsors of this Act. Refusal to protect property from wilful destruction by others is so contrary to our individual and collective sense of justice that it is quite impossible to extend the meaning of language so as to exclude such protection without affirmative and specific words to that effect.

The decree is reversed, with instructions to enter one consistent with the views expressed in this opinion.