**HOUSTON & NORTH TEXAS MOTOR FREIGHT LINES, Inc., v. LOCAL UNION NO. 886 OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLEMEN, AND HELPERS OF AMERICA et al.**

No. 2040.

District Court, W. D. Oklahoma.

Aug. 8, 1938.

Dudley, Hyde, Duvall & Dudley, of Oklahoma City, Okl., for complainant.

Charles W. Schwoerke of Oklahoma City, Okl., for respondents.

MURRAH, District Judge.

This is a suit in equity to enjoin Local Union No. 886 of International Brotherhood of Teamsters, Chauffeurs, Stablemen, and Helpers of America and certain individual members thereof from striking or sponsoring a strike involving the complainant's employees.

The complainant is a corporation organized under the laws of the state of Texas, domiciled in the state of Texas, authorized to do business in the state of Oklahoma and is engaged in the operation of motor trucks in the transportation of property as an interstate motor carrier for hire between the states of Texas and Oklahoma; being subject to the regulation of the Motor Carrier Act of 1935, 49 U.S.C.A. § 301 et seq., and is at this time, as alleged in its complaint, operated under a license, or permit, granted to it by the authorities constituted under the Motor Carrier Act and as such is engaged in interstate commerce as authorized by the Interstate Commerce Commission of the United States; that under the license, or permit, as granted by the Interstate Commerce Commission, it is required to accept for transportation over its lines, all freight offered it by the shipping public. In the furtherance of its business it maintains in the city of Oklahoma City its terminal, warehouse, trucks, and other motor vehicles and employs in the state of Oklahoma approximately eight individuals, including truck drivers, dock workers, and warehousemen. That the complainant is engaged in the business of interstate commerce and that its operation is governed by the regulatory bodies having jurisdiction over such business is not disputed.

Complainant alleges that the respondents entered into a conspiracy and agreement for the purpose of preventing the complainant from operating its business and in furtherance thereof on the 27th day of January, 1938, the officers of the respondent, Local Union No. 886, and various members and persons affiliated with said Union commanded employees of the complainant at its Oklahoma City terminal to quit work at noon on that day and to remove no further freight. That some of the employees of complainant did quit work and that the officers of said Union did refuse to permit complainant's other employees or employees of the patrons of the complainant to transport freight to and from its Oklahoma City terminal, demanding from complainant that any employee handling such freight should first become a member of Local Union No. 886. That the respondent Union further prevented its interlining carriers from delivering shipments to the complainant's dock for for-

warding over its line. That in order to effect the purposes of said conspiracy and to carry out the plan and agreement the respondents made threats of violence, intimidation and coercion against the complainant, its employees and employees of other carriers attempting to deliver freight to the dock of the complainant for forwarding over the lines of the complainant.

The complainant sets out in detail a number of acts of violence which the complainant alleges the respondents sponsored or fostered, which prevented complainant from operating its business and thereby interfered with the free flow of interstate commerce.

The complainant specifically states that the respondents stopped its trucks after leaving Oklahoma City and Oklahoma County and before reaching the state line, took the drivers from the trucks of complainant, injuring one and that they threatened others with violence if they attempted to enter upon the premises of complainant where the dock was located and state that the respondent, Local Union No. 886, and its parties named in this caption, authorized and sponsored such acts of violence, coercion and intimidation. The complainant alleges it has no adequate remedy at law; that it has called upon the Municipal Police Department for aid and assistance and that the Municipal authorities are unable to afford the protection adequately necessary to allow complainant to continue in the operation of its business. That they have called upon the State Highway Patrol, the Sheriff of Oklahoma County and advised them of the conditions. That the trucks of the complainant, in the operation of its business upon the highways, traverse several counties and that the Local Enforcement Officers do not have jurisdiction beyond the county lines and that protection cannot be afforded except upon specific calls therefor and at specific times. That such protection is wholly inadequate to render such protection as to permit complainant to operate its business upon the highway of the state of Oklahoma.

The complainant further alleges that no labor dispute exists between it and the respondents because it has negotiated with an appropriate bargaining unit, selected and designated as a Committee by more than fifty-one per cent of its employees in the states of Texas and Oklahoma, as provided by the National Labor Relations Act, 29 U.S.C.A. § 151, et seq., and has made and executed a contract governing wages, hours, working conditions of all its employees and particularly those engaged in warehouse, dock work and truck drivers. That the said contract is in full force and effect, the terms of which contract are entirely satisfactory to all its employees and is binding upon the complainant and it is therefore unable to further negotiate or bargain with Local Union No. 886 or any other Committee or agency purporting to represent its employees so long as said contract remains in force and effect.

The complainant asks that the respondent, its agents, servants, and employees and all persons with them be perpetually restrained and enjoined from trespassing on the premises and property occupied and used by complainant; from interfering with the loading or unloading of complainant's trucks and vehicles, and from interfering with other persons attempting to deliver or receive freight from the complainant by intimidation, threats, abuse or physical force or in any manner interfering with the complainant's employees or agents in the conduct of its business at any point or place within the jurisdiction of this Court. They further asked that the respondent and its agents, servants and employees and those acting under them be restrained from committing acts of intimidation, violence or threats of violence, from annoying, molesting, persuading or soliciting any customers or prospective customers of complainant to cease carrying on or transacting business with complainant and from seeking by coercion to have complainant discharge its employees, and to compel complainant's employees to become members of Local Union No. 886 or to accept Local Union No. 886 as the bargaining agent and representative of complainant's employees.

The respondents made their voluntary appearance and waived formal hearing of the order to show cause and agreed to the presentation of the application for an injunction. The respondents deny that they have in any way participated, sponsored, aided or abetted any acts of violence as complained of in the petition of the complainant but admit that the respondent Union has called a strike of the employees of the complainant company for the purpose of compelling the said company to accept Local Union No. 886 as the appropriate bargaining agency and to compel said company to sign a contract with said Union

concerning wages, hours and working conditions of the employees of the complainant in Oklahoma City. That it specifically denies that they are responsible for any violence, intimidation or physical force and agree that the Court may enter its order restraining the respondent Union, its agents, servants and employees from committing any acts of violence, intimidation or physical force or doing any other acts, except peaceable picketing in order to compel the complainant to recognize Local Union No. 886 as a proper bargaining unit and to compel them to enter into a contract concerning wages, hours, and working conditions. They deny the Union, with which the complainant has bargained and contracted, is a proper unit within the meaning of the National Labor Relations Act and state that the contract now existing between complainant company and its employees is a proper contract; that the same is what is commonly known as a "Yellow Dog Contract" and not in conformity with the contracts existing between other companies and their employees engaged in a similar business and therefore constitutes a discrimination and gives the complainant an advantage over other companies doing a like or similar business.

The respondents contend further that there is a labor dispute existing within the meaning of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, 47 Stat. 70, Act of March 23, 1932, and that the Court in considering whether or not an injunction should issue is bound by the provisions of the Norris-LaGuardia Act, supra, and that under the provisions of said Act it is not unlawful for the respondent Union to picket and use peaceful means of persuasion to effect the purposes intended by the strike.

The complainant further contends that the acts of the respondents are an unlawful interference with the interstate commerce and that this Court should exercise its equitable jurisdiction to keep open the free flow of interstate commerce by enjoining the alleged unauthorized acts of the respondents.

The case comes on for hearing with issues joined, as above stated. The complainant will hereinafter be designated as the "Company" and the respondents will hereinafter be called the "Union."

The Company is a trucking company operating a motor freight line business between the states of Oklahoma and Texas and in addition to soliciting business from points in Texas and Oklahoma, it also hauls a certain amount of freight, which is commonly called "Interlined Freight"; that is to say, freight is delivered from other trucking companies to the docks of the Company for forwarding to points beyond which the other companies operate and likewise delivers freight to the docks of other companies in Oklahoma City and other points to be forwarded by other companies operating beyond the terminus of the complainant Company.

It is not denied that the company is engaged in interstate commerce; that it operates under the Motor Carrier Act of 1935 and is subject to the rules and regulations of the Interstate Commerce Commission relating to tariff and schedule. It may therefore be concluded that this case involves interstate commerce and one coming properly within the scope of federal jurisdiction relating thereto. The Company maintained a dock and warehouse in Oklahoma City whereat it employed, prior to January 20, 1938, four workers, engaged in the physical handling of freight; that is either truck drivers, dock workers or warehousemen. On or about January 20, 1938, the respondent Union submitted to Mr. Cates, the Managing Officer of the Company, a proposed contract governing or concerning wages, hours, and working conditions for all employees employed by the Company at Oklahoma City. Four or five months prior to January 20, 1938, a temporary committee, composed of employees of the Company, had discussed with Cates the organization of a Union, looking toward collective bargaining for wages, hours, and working conditions of employees. That about January 1, 1938, the Committee representing approximately seventy per cent of the employees of the Company presented a petition to the Company requesting that they be recognized as the "Employees' Committee." That the said petition contained about seventy per cent of the original signatures of the employees. This Union is known as the National Association of Motorized Common Carrier Truck Line Employees. Negotiations for a contract between the Committee and the Company was begun and a contract governing wages, hours, and conditions of employment was executed and the employees of the Company are now operating under the provisions of that contract.

Before final execution of the contract the respondent Union called the four employees of the Company, at Oklahoma City, out on strike and the four employees engaged in the physical handling of the freight left the employ of the Company and began picketing the dock and thereafter one of the Company's trucks was stopped between Oklahoma City, Oklahoma, and the state line. The truck driver was removed from the truck and badly beaten. Just who was responsible for this act of violence was not definitely determined. The respondent Union continued to picket the premises of the Company and to warn employees of other companies not to deliver or pick up freight at the dock of the Company.

Prior to January 27, 1938, the date on which the strike was called, the Company's average business per month was one million, eight hundred thirty-three pounds of freight. This was an average over the months of October, November, and December; that since the strike the Company has lost about sixty per cent of its business. After execution of the contract between the Company and its employees, two of the employees in Oklahoma City, Oklahoma, returned to work under the contract. The two remaining employees did not return to work and are now on strike and are named as respondents in this suit. There is no evidence that the Company inspired the organization of the Union with which it negotiated and eventually consummated a contract or that it aided or assisted in any way, counseled, advised or contributed in any way toward its organization. There is an abundance of evidence to the effect, both by the Company and its employees, that the Company positively refrained from making any suggestions concerning the organization of its employees. Insofar as the record discloses the contract under which the Company is now operating with its employees is entirely satisfactory and all of its employees, both in Texas and Oklahoma, with the exception of the two mentioned are satisfied with all of its provisions. The contract was introduced in evidence and two of the employees working in Oklahoma City, Oklahoma, who went out on the strike, testified that all four of the employees went to Texas, counseled with other employees at Dallas, Texas, concerning the Union and the contract and thereafter two of them joined said Union and returned to work as members of said Union and are now working under the provisions of that contract.

The respondent Union does not contend that it represents a majority of the employees of the Company in Texas or Oklahoma or that they have invoked the provision of the National Labor Relations Act pertaining to the determination of the proper bargaining unit, as provided thereby, but contend that they are not required to organize the employees or to attempt to organize the employees or to petition the National Labor Relations Board to determine the proper bargaining unit for the craft. That peaceful picketing and persuasion as carried on by them is lawful under the public policy as announced in the Norris-LaGuardia Act, supra. That there is a labor dispute and that this court is without jurisdiction to render injunctive relief to the Company except in conformity with the Norris-LaGuardia Act, supra.

The questions presented for the determination of the Court under these facts are:

First: Does a labor dispute exist between the Company and the respondent Union within the meaning of the Norris-LaGuardia Act?

Second: Are the acts of the respondents those which are declared to be lawful and within the permissible limits of the Norris-LaGuardia Act and therefore beyond the reach of a court of equity?

Third: Does the National Labor Relations Act impose a limitation upon the Norris-LaGuardia Act, supra, sufficient to require the respondent Union to petition the National Labor Relations Board under provision of this Act to determine the proper bargaining unit and whether or not after the Company having complied with all the provisions of the National Labor Relations Act pertaining to collective bargaining, are entitled to the protection of a court of equity to enable them to carry on their interstate commerce free of interference from strikes and picketing.

As has been stated by one learned Jurist: "No more unusual question has ever perplexed the mind of a Judge."

The history of the struggle between labor and capital as portrayed by the decisions of our Courts does not materially aid in the solution of the legal questions presented here. The questions presented being necessarily social and economic give rise to wide differences of opinion con-

cerning the equities of the parties. In order to properly consider the meaning and effect of the Norris-LaGuardia Act, supra, and the National Labor Relations Act, supra, which were undoubtedly enacted for the purpose of limiting and circumscribing the equitable jurisdiction of the Federal Courts, it is necessary to consider the legislative background or history of legislation previously enacted for the benefit of labor and to consider the interpretation given to such legislation by the courts and especially the Supreme Court of the United States in the light of changing social and economic conditions under which legal effect was given to such legislation.

The Norris-LaGuardia Act, supra, may well be said to be a rebirth or vitalization of Section 20 of the Clayton Act, 38 Stat. 730 et seq., 29 U.S.C.A. § 52, which provided:

"*Statutory restriction of injunctive relief*. No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States. (Oct. 15, 1914, c. 323, § 20, 38 Stat. 738.)"

Since very early in the industrial history of our country Congress has enacted much legislation aimed at the respective rights of employer and employee and with the view of minimizing industrial strife by a peaceful conciliation of the controversies between employer and employee concerning wages, hours and conditions of employment. Many writers express grave doubt that the courts have given to that legislation the effect intended by the legislative bodies in the enactment of this legislation.

The Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note 26 Stat. 209, Act of July 2, 1890, was enacted for the purpose of protecting interstate commerce from the evils of conspiracy resulting in monopolies formed by industry to prevent the free flow of commerce by active competition. Although it is doubted that the Congress had labor in mind at the time of its enactment, it soon became an active weapon wielded by industry to prevent labor from organizing and from striking for the reason that striking employees engaged in picketing and peaceful persuasion or by acts of violence prevented the free flow of commerce and thereby interfered with interstate commerce and courts of equity promptly enjoined such concerted acts on the part of labor which operated to retard and hinder the organization of labor and the effective perpetuation of its purposes.

The Act of June 1, 1898, 30 Stat. 424, in the language of the Congressional Committee, which presented it to Congress for passage, was a bill "Having for its object the settlement of disputes between capital and labor as far as the interstate transportation companies are concerned. The necessity for the bill arises from calamitous results in the use of ill caused strikes arising for the tyrany of capital or the unjust demands of labor organizations, whereby the business of the country is brought to a standstill and thousands of

employees with their helpless wives and children are confronted with starvation."

Section 10 of the Act of June 1, 1898, 30 Stat. 424, made it an offense against the laws of the United States for any employer to require any person seeking employment, as a condition of such employment, to enter into an agreement, either written or verbal, not to become or remain a member of any labor organization or to threaten any employee with loss of employment or discriminate against any employee for his membership in a Labor Organization. This section of the Act was declared unconstitutional by the Supreme Court of the United States. In that case Justice Harlan stated for the majority of the Court that: "An employer has the same right to prescribe terms in which he will employ one to labor as an employee has to prescribe on which he will sell his labor, and any legislation which disturbs this equality is an arbitrary and unjustifiable interference with liberty of contract."

It is significant to observe that the Court further said: "The power to regulate interstate commerce, while great and paramount, cannot be exerted in violation of any fundamental right secured by other provisions of the National Constitution." Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann.Cas. 764.

Justice McKenna and Justice Holmes delivered separate dissenting opinions. Justice McKenna mentioned a previous act of Congress of similar purport (25 Stat. 501) enacted in 1888 and stated: "We are told that labor associations are to be commended. May not, then, Congress recognize their existence; yes, and recognize their power as conditions to be counted with in framing its legislation? Of what used would it be to attempt to bring bodies of men to agreement and compromise of controversies if you put out of view the influences which move them or the fellowship which binds them,—maybe controls and impels them, whether rightfully or wrongfully, to make the cause of one the cause of all? And this practical wisdom Congress observed,—observed, I may say, not in speculation or uncertain prevision of evils, but in experience of evils,—an experience which approached to the dimensions of a national calamity. The facts of history should not be overlooked nor the course of legislation."

Justice McKenna stated that the act of 1898 was for the purpose of remedying the evils which the Act of 1888 had failed to reach or avert.

The doctrine as announced in the Adair Case was followed and approved in the case of Coppage v. State of Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A. 1915C, 960. In this case the Supreme Court of the United States reversed a decision of the Supreme Court of the State of Kansas in which the Supreme Court of Kansas had sustained an act of the State of Kansas similar to Section 10 of the Act of June 1, 1898, 30 Stat. 424. Justice Day and Justice Hughes (Now Chief Justice Hughes) dissented from that opinion in which they upheld the right of the state to enact such legislation. In the same year (1908) the Supreme Court of the United States in Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815, stated in an opinion, written by Justice Fuller: "A combination of labor organizations and the members thereof, to compel a manufacturer whose goods are almost entirely sold in other States, to unionize his shops and on his refusal so to do to boycott his goods and prevent their sale in States other than his own until such time as the resulting damage forces him to comply with their demands, is, under the conditions of this case, a combination in restraint of interstate trade or commerce within the meaning of the Anti-Trust Act of July 2, 1890, and the manufacturer may maintain an action for threefold damages under § 7 of that act [15 U.S.C.A. § 15 note]."

Thus it was established that labor combinations came within the inhibitions of the Anti-Trust Act and that they were amenable to the Anti-Trust Laws. This afforded an effective means of preventing the organization of labor and their concerted action for higher wages and better working conditions.

It was again held in Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341: "Irrespective of compulsion or even agreement to observe its intimation, the circulation of a 'we don't patronize' or 'unfair' list manifestly intended to put the ban upon those whose names appear therein, among an important body of possible customers, combined with a view to joint action and in anticipation of such reports, is within the prohibition of the Anti-trust Act of July 2, 1890, if it is intended to restrain and does restrain commerce among the States."

The Court further held that the defendants, members of labor unions who paid their dues and continued to delegate authority to their officers to unlawfully interfere with the interstate commerce of other parties, are jointly liable with such officers for the damages sustained by their acts. Soon thereafter it was held by a majority opinion of the Supreme Court of the United States that a private person could not maintain a suit for an injunction under the provisions of the Act of July 2, 1890, 26 Stat. 209, 15 U.S.C.A. §§ 1–7, 15 note (Sherman Anti-Trust Act). Paine Lumber Company v. Neal, 244 U.S. 459, 37 S.Ct. 718, 61 L.Ed. 1256.

On October 15, 1914, Congress enacted the law known as the Clayton Anti-Trust Act, 38 Stat. 730, which established the right of private parties to an injunction in proper cases and further contained Section 20, supra, and Section 6, 15 U.S.C.A. § 17, from which is derived both in principle and in letter the Norris-LaGuardia Act.

On December 10, 1917, in the case of Hitchman Coal & Coke Co. v. Mitchell, Individually, et al., 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann. Cas.1918B, 461, the Court upheld a decree of a lower court, enjoining the United Mine Workers of America in attempting to unionize the employees of the Hitchman Coal & Coke Company on the grounds that it was a common law conspiracy and unreasonable restraint of trade and especially a conspiracy against the right of Non-Union Miners in West Virginia and for the further reason that the defendant Union's effort to compel the plaintiff, Hitchman Coal & Coke Company, to enter into contractual relations with the Union relating to the employment of labor and the production of coal, although having knowledge of an expressed contract existing between plaintiff and its employees, which excluded relationship with the Union, endeavored by unlawful means to secure breach of this contract by the employees. The Court had under consideration a contract existing between the employer and employees where it was agreed in substance that the employee, while retaining such relationship with the employer, would not join any Union and that if he did join any Union he would discontinue his employment with the company.

Justice Brandeis dissented from this opinion in which Justice Holmes and Justice Clarke concurred. The dissenting opinion upheld the right of the Union to exercise any peaceful means of inducing employees to join a Union with the intention thereafter to employ a strike unless the employer consented to unionize his shop. Justice Brandeis could see nothing objectionable in the activities of the Union in this case insofar as they used peaceful means and methods to induce nonunion men to join a Union, notwithstanding their existing contract as between the employer and employee not to join a Union during the tenure of their employment.

It is strikingly apparent from this line of decisions that the Supreme Court has been in constant disagreement concerning the policy to be pursued by the Courts in giving effect to the common law right of labor to organize and by such organized and concerted action to further the purposes of its organization in the field of wages, hours and conditions of employment.

Sections 6 and 20 of the Clayton Anti-Trust Act; 15 U.S.C.A. §§ 12–27, 44; 18 U.S.C.A. § 412; 28 U.S.C.A. §§ 381–383, 386–390; 29 U.S.C.A. § 52, 38 Stat. 730, Act of Oct. 15, 1914, were not discussed in either the majority or the minority opinions of the Court. It not having been shown that it was the proper subject of interstate commerce and this decision is important only insofar as it points to the interpretation of the common law right of employees to unionize and to assert its influence toward the unionization of members of its craft.

The injunctive provision of the Clayton Anti-Trust Act (Section 20) received exhaustive study in the case of the Duplex Printing Press Company v. Deering et al., 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196. This case was decided on January 3, 1921. The Court said:

"In determining the right to an injunction under the Clayton and Sherman Acts, the legality or illegality of a boycott under the common law or under the statutes of a particular State is of minor consequence, since the acts of Congress are paramount in their field and must be given full, independent effect."

"It is settled by decisions of this court that a restraint of interstate commerce produced by peaceable persuasion violates the Sherman Act, and is not justified by the fact that the participants in the combina-

tion or conspiracy have an object beneficial to themselves or their associates which they might have been at liberty to pursue in the absence of the statute."

"Section 6 of the Clayton Act, in declaring that nothing in the anti-trust laws shall be construed to forbid the existence and operation of labor organizations or to forbid their members from lawfully carrying out the legitimate objects thereof, and that such organizations or their members shall not be construed to be illegal combinations or conspiracies in restraint of trade, assumes that the normal objects of such organizations are legitimate, but contains nothing to exempt them or their members from accountability when they depart from objects that are normal and legitimate and engage in an actual combination or conspiracy in restraint of trade. It does not authorize any activity otherwise unlawful, or enable a normally lawful organization to cloak such an illegal combination or conspiracy."

"The first paragraph of § 20 of the Clayton Act—which provides that injunctions shall not be granted in any case between an employer and employees, etc., growing out of a dispute concerning the terms and conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and that such property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney,—is merely declaratory of the law as it stood before."

"The second paragraph of § 20 of the Clayton Act, which provides that 'no such * * * injunction shall prohibit' certain specified acts, manifestly refers to injunctions in any case of the character mentioned in the paragraph preceding, namely, 'a case between an employer and employees * * * involving, or growing out of, a dispute concerning terms or conditions of employment;' and the concluding words of the second paragraph, 'nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States,' are to be read in the light of the context, and mean only that those acts are not to be so held when committed by parties concerned in a 'dispute concerning terms or conditions of employment.'

"As the section imposes an exceptional and extraordinary restriction upon the equity powers of the federal courts, and upon the general operation of the anti-trust laws, conferring a special privilege or immunity upon a particular class to the detriment of the general public, the rules of statutory construction forbid that the privilege be enlarged by resorting to a loose construction or by ignoring or slighting the qualifying words of the section."

"This section confines the exceptional privilege to those who are proximately and substantially concerned in an actual dispute respecting the terms or conditions of their own employment, past, present or prospective; it does not use the words 'employers and employees' in a general class sense, or treat all the members of a labor organization as parties to a dispute which proximately affects but a few of them."

"That the Clayton Act was not intended to legalize the secondary boycott is shown by its legislative history."

"In construing an act of Congress, debates expressing views and motives of individual members may not be resorted to, but reports of committees and explanatory statements in the nature of a supplemental report made by the committee member in charge of the bill in course of passage, may."

By this decision the Supreme Court reversed a divided opinion of the Circuit Court of Appeals of the Second Circuit which had held that Section 20 of the Clayton Act, supra, precluded the courts from granting an injunction or from granting injunctive relief in cases involving the right of labor to organize, to bargain collectively and by concerted action to use peaceful means and methods of persuasion to unionize and strike for wages, hours and conditions of employment. Justice Brandeis, Justice Holmes and Justice Clarke joined in a vigorous dissenting opinion in which they insisted that Sections 6 and 20 of the Clayton Anti-Trust Act, supra, placed a limitation upon a Court of Equity to interfere in labor disputes such as the one in question. Justice Brandeis in his dissenting opinion reviewed in chronological detail the history of labor legislation from the time it was first treated by the legislative and judicial bodies in England. He reviewed the common law right of employees to strike for purposes of fostering its own interests. Quoting from his dissenting opinion:

"May not all with a common interest join in refusing to expend their labor upon articles whose very production constitutes an attack upon their standard of living and the institution which they are convinced supports it? Applying common law principles the answer should, in my opinion, be: Yes, if as matter of fact those who so co-operate have a common interest.

"The change in the law by which strikes once illegal and even criminal are now recognized as lawful was effected in America largely without the intervention of legislation. This reversal of a common-law rule was not due to the rejection by the courts of one principle and the adoption in its stead of another, but to a better realization of the facts of industrial life."

Justice Brandeis, after analysing and breaking down phrase by phrase of Section 20 of the Clayton Act, supra (254 U.S. page 484, 41 S.Ct. page 182), stated:

"This statute was the fruit of unceasing agitation, which extended over more than 20 years and was designed to equalize before the law the position of workingmen and employer as industrial combatants. Aside from the use of the injunction, the chief source of dissatisfaction with the existing law lay in the doctrine of malicious combination, and, in many parts of the country, in the judicial declarations of the illegality at common law of picketing and persuading others to leave work. The grounds for objection to the latter are obvious. The objection to the doctrine of malicious combinations requires some explanation. By virtue of that doctrine, damage resulting from conduct such as striking or withholding patronage or persuading others to do either, which without more might be damnum absque injuria because the result of trade competition, became actionable when done for a purpose which a judge considered socially or economically harmful and therefore branded as malicious and unlawful. It was objected that, due largely to environment, the social and economic ideas of judges, which thus became translated into law, were prejudicial to a position of equality between workingman and employer; that due to this dependence upon the individual opinion of judges great confusion existed as to what purposes were lawful and what unlawful; and that in any event Congress, not the judges, was the body which should declare what public policy in regard to the industrial struggle demands.

"By .1914 the ideas of the advocates of legislation had fairly crystallized upon the manner in which the inequality and uncertainty of the law should be removed. It was to be done by expressly legalizing certain acts regardless of the effects produced by them upon other persons. As to them Congress was to extract the element of injuria from the damages thereby inflicted, instead of leaving judges to determine according to their own economic and social views whether the damage inflicted on an employer in an industrial struggle was damnum absque injuria, because an incident of trade competition, or a legal injury, because in their opinion, economically and socially objectionable. This idea was presented to the committees which reported the Clayton Act. The resulting law set out certain acts which had previously been held unlawful, whenever courts had disapproved of the ends for which they were performed; it then declared that, when these acts were committed in the course of an industrial dispute, they should not be held to violate any law of the United States. * * * By including 'employers and employees' and 'persons employed and persons seeking employment' it showed that it was not aiming merely at a legal relationship between a specific employer and his employees. * * * The further contention that this case is not one arising out of a dispute concerning the conditions of work of one of the parties is, in my opinion, founded upon a misconception of the facts.

"Because I have come to the conclusion that both the common law of a state and a statute of the United States declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest, I do not wish to be understood as attaching any constitutional or moral sanction to that right. All rights are derived from the purposes of the society in which they exist; above all rights arises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat."

I have quoted at length from the dissenting opinion because time and events have brought the philosophy thus announced into bold relief and have undoubtedly by legislative action and judicial interpretation adopted this philosophy as the governing law in such cases. But the law of the case as announced by the majority required that the relationship of the employer and employee exist before the immunities from injunctive relief as specified in Sections 6 and 20 of the Clayton Act, supra, would apply.

Section 20 of the Clayton Act, supra, was again before the court in the American Steel Foundries v. Tri-City Central Trades Council et al., 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360, decided by the Supreme Court of the United States on December 5, 1921. In that case the District Court entered an injunctive decree in a labor controversy before the enactment of the Clayton Act, which case was pending on appeal in the Circuit Court of Appeals when the Clayton Act was approved, and it was there held that Section 20 of the Clayton Act applied and was controlling of the facts. The Court there held, in an opinion by Chief Justice Taft, that the second paragraph of Section 20 of the Clayton Act did not apply to the dispute between an employer and persons who are neither ex-employees nor seeking employment and cited Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196. The Court further held that Section 20 of the Clayton Act was merely declaratory and stabilizing of what had always been the best equity practice by the Court but the Court in this case upheld the right of peaceful picketing and persuasion and distinguished this case from the Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461, and the Duplex Printing Press Co. v. Deering, supra.

Quoting from the body of the opinion delivered by Justice Taft (page 78):

"Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects. They have long been thus recognized by the courts. They were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda without more, to be without excuse and malicious. The principle of the unlawfulness of maliciously enticing laborers still remains and action may be maintained therefor in proper cases."

In substance, the Court held that a labor union had sufficient interest in the wages paid to the employees of any employer in the community to justify their use of lawful and peaceful picketing and persuasion to induce those employees not to accept such reduced wages and to quit their employment and the judgment of the Circuit Court of Appeals of the Second Circuit was modified to that extent.

During the same term of Court the Supreme Court of the United States decided the famous case of Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375. The Court in that case had before it a provision of an Arizona Statute (Arizona Revised Statutes 1913, Civ.Code, paragraph 1464.) This statute was similar to Sections 6 and 20 of the Clayton Act in many respects. The Court in holding that the statute violated the equal protection clause of the Constitution of the United States refrained from holding that Section 20 of the Clayton Act violated the

14th Amendment to the Constitution of the United States, U.S.C.A.Const. Amend. 14, but that the equal protection clause of the 14th Amendment did not apply to Congressional but only to state action. In referring to the holding of the Court in American Steel Foundries v. Tri-City Central Trades Council, Chief Justice Taft stated (page 132):

"We held that under these clauses [Sec. 6 and 20 of the Clayton Act] picketing was unlawful, and that it might be enjoined as such, and that peaceful picketing was a contradiction in terms which the statute sedulously avoided, but that subject to the primary right of the employer and his employees and would-be employees to free access to his premises without obstruction by violence, intimidation, annoyance, importunity, or dogging, it was lawful for ex-employees on a strike and their fellows in a labor union to have a single representative at each entrance to the plant of the employer to announce the strike and peaceably to persuade the employees and would-be employees to join them in it. We held that these clauses were merely declaratory of what had always been the law and the best practice in equity, and we thus applied them."

The Court did hold factually that the picketing amounted to boycott and unlawful intimidation and coercion; said that the statute was unconstitutional and the District Court of the state of Arizona should have granted the injunction on the petition as presented. To this opinion Justice Holmes, Justice Pitney and Justice Clarke dissented. Justice Holmes rendered separate opinion and Justice Pitney and Justice Clarke rendered joint dissenting opinions. Justice Brandeis wrote an exhaustive and far reaching dissenting opinion in which he meticulously reviewed the history of the law relating to labor in England and America; detailing modification of the common law affecting or governing labor disturbances; the lawfulness of picketing and the right of labor to picket as a means of furthering or sponsoring its self interest. After stating that the rules governing the struggles between employer and employed had been subjected to many modifications, he succinctly pointed out that in England until 1824 it was punishable as a crime if fellow workmen combined to raise wages or shorten hours or to affect business in any way, even if there was no resort to strike.

In 1906 the Act of inducing workers to break their contract of employment heretofore an actionable wrong was expressly declared legal. In New Zealand arbitration and compliance with the awards of arbitration was compulsory.

Justice Brandeis reviewed decisions construing the common and statutory law with reference to picketing, the right of self-organization and the power of the Court to control the same by right of equity jurisdiction in America since 1888, pointing out the many abuses of that power by the Courts of this country. He, also, reviewed with great detail the history of state and federal legislation by which it was intended to limit and control the power of the Courts to govern the relationship of employer and employees by injunctive decree, making reference specifically to various bills which were introduced in Congress and passed by one of the branches of Congress or had received notable attention at Committee hearings, intended to give freedom of organization, peaceable picketing, notoriety by speech and press and to that end encourage organization of labor unions and to protect that right by limiting the equity power of the Courts to interfere. All of which had its ultimate consummation in the enactment of section 20 of the Clayton Act, supra, on October 15, 1914. This law, he pointed out, was designed to remove all doubt of the right of labor to organize, to bargain for higher wages, shorter hours and improved working conditions and to use peaceful picketing and persuasion in effecting the purposes thereof and to that end to limit and circumvent the powers of the Federal Court to abridge that right by injunctive decree.

The minority, as represented by Justice Brandeis, did not believe that the decisions of the Supreme Court of the United States gave expression to the intent of such legislation but that it was the tendency of the decisions of the court to circumvent and limit the legislative policy intended to give freedom of organization, peaceable picketing, notoriety by speech and press and the courts were given undue latitude in preventing the free exercise of that right. The majority views did not go unchallenged and we find a worthy champion, not without logic or reason, in the tendency of the strong minority to give effect to the beneficial legislation and it is most interesting to observe that the minority of yester-

day is the majority today. We must therefore approach the consideration of this class of legislation in the light of the reasoning announced by the minority at the time these decisions were written so that the law as changed by legislative action and now before us for consideration must be interpreted in accordance with the views of the minority as originally announced.

■ This leads us to speculate on what the minority would have held had this same statement of facts been before the Supreme Court under the provisions of Section 20 of the Clayton Act, supra. But this is unnecessary because the ones who disagreed with the doctrine as announced by the majority in the cases just reviewed secured the enactment in 1932 of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101-115, inclusive. No doubt the framers of this legislation had before them Section 20 of the Clayton Act, at the time of this draft. No doubt they had before them the opinions of the Supreme Court of the United States construing that Act and there can be no doubt that it was the intention of Congress to further limit and circumvent the power of Courts of Equity to enjoin by injunctive decree the acts of labor organizations in furtherance of its right of self-organization and peaceful picketing. The difficulty seems to be, not in the recognition of the right of labor to organize, not in the recognition of labor to bargain for wages, hours, and working conditions but what means may be considered lawful in effecting that end. The Courts have had no difficulty in agreeing that labor might exercise all lawful means to effect its purposes, but what some considered lawful, others considered unlawful and therefore a proper subject of injunctive control. When the Norris-LaGuardia Act, supra, is placed alongside Section 20 of the Clayton Act, as construed by the Courts at the time of the enactment of the Norris-LaGuardia Act, in 1932, the compelling conclusion is that the Norris-LaGuardia Act was designed to make lawful that which the Courts had construed to be unlawful under its interpretation of Section 20 of the Clayton Act, supra. The Norris-LaGuardia Act, supra, therefore, included all the provisions of the Clayton Act and limited the jurisdiction of the Courts of Equity to issue restraining orders or temporary injunctions in cases growing out of labor disputes except in strict conformity with provisions of the Act and in accordance with the declaration of public policy contained in Section 2 of the Act, 29 U.S.C.A. § 102. I think we can say that there is nothing in the declared public policy which had not heretofore been recognized by the Courts and that this Section is merely declaratory of what many had declared to be the law prior to its enactment.

In Section 3, Norris-LaGuardia Act, supra, 29 U.S.C.A. § 103, Congress intended, no doubt, to go further in its far reaching remedial purposes. Subsections (a), (b), (c), of Section 13 of the Act, 29 U.S.C.A. § 113(a–c), defines a labor dispute as follows:

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Therefore, in determining whether or not a labor dispute exists under the facts presented here, it is necessary for us to analyze, insofar as it is possible to do so, the meaning of the foregoing in the light of present day trend of the decisions relating to this act and those similar.

Subdivision (a): A case shall be held to involve or grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft or occupation or have direct or indirect interest therein. The complainant and respondents are engaged in the same industry, trade, craft and occupation or have direct or indirect interest therein.

Subdivision (1) of (a): Whether such dispute is between one or more employers or associations of employers and one or more employees or association of employees. The dispute is not between one or more employers or association of employers and one or more employees or association of employees. Excluding the two employees who formerly worked for the company prior to the strike of January 27, 1938. Subdivision (2) of (a): Whether between one or more employers or association of employers and one or more employers. Subdivision (3) of (a): Or between one or more employees or associations of employees and one or more employees or association of employees; or when the case involves any conflicting or competing interests in a labor dispute (as hereinafter defined.) Subdivision (b): Provides that a person or an association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it and if he or it is engaged in the same industry, trade, craft or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

The case before us may be said to be between one or more employees or association of employees and one or more employees or association of employees. It may also be said to involve a conflicting or competing interest in a labor dispute if that dispute be defined as one against which relief is sought because it is engaged in the same industry, trade, craft or occupation in which the dispute occurs. It cannot be said that the respondents do not have an indirect interest therein or that they are not a member, officer or agent of an association of employees engaged in such industry, trade, craft or occupation, especially if that direct or indirect interest be construed to be advancement and improvement of wages, hours, and working conditions. It may also be said to be a controversy concerning terms or conditions of employment because the respondents herein contend that the terms and conditions of employment provided in the existing contract between employer and employees is not consistent with contracts existing between employers and employees in the same industry, trade, craft or occupation. It, also, may be said to be a controversy concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment; especially if considered in the light of "Whether or not the disputants stand in the proximate relation of employer and employee."

It is clear that it was the intention of Congress to remove the barriers raised in the former decisions of the Supreme Court of the United States which required the relationship of employer and employee in order to constitute a labor dispute. It is, also, clear that Congress intended to provide that only an indirect interest was necessary in order to include a party within the meaning of a labor dispute.

What is indirect interest? In the light of Justice Brandeis' dissenting opinions in Truax v. Corrigan, supra, and Duplex Printing Press Co. v. Deering, supra, it is interest designed to improve higher wages, better working conditions and shorter hours and thereby a higher standard of living among those engaged in labor.

In 1931 the State of Wisconsin enacted a law legalizing peaceful picketing and allied activities and limiting the equitable powers of the Courts to control the same by injunctive decree. Wisconsin Statutes 1935, §§ 103.51 to 103.63; Wisconsin Laws 1931, c. 376; Laws of 1935, c. 551, § 5.

The Supreme Court of the State of Wisconsin in Senn v. Tile Layers Protective Union, Local No. 5, et al., 222 Wis. 383, 268 N.W. 270, 872, upheld the right of the Tile Layers Protective Union, Local No. 5, to picket an employer because of his refusal to sign their contract, solely because one of the provisions of the contract prohibited him from engaging in the use of the tools of the trade on the job. The majority of the Court were of the opinion that peaceful picketing and similar acts to compel employ-

er to observe trade union rules governing hours, wages, apprenticeship and other working conditions was lawful and invaded no legal right of the contract, even though he could not successfully operate his business under such conditions and that under the statutes of the state of Wisconsin, supra, the Court of equity was without jurisdiction to grant an injunction because no unlawful acts would be committed and no boycott practiced.

Two of the learned Jurists dissented. Justice Fowler stated (page 276): "The practice upheld by the court is Un-American, oppressive and intolerable. It is contrary to the concept that I have always had of the fundamental and inalienable rights of the individual citizen secured to him by the Constitution of the United States. I cannot see that concept held for naught by this court without protest. And I will not yield that concept until it is declared erroneous by the final arbiter of that Constitution. My concept of the inherent rights of man under the Constitution may be merely an ideal that I may eventually have to give up, but I am still strong in my faith in it; and \I will ever cherish it unless it) shall be destroyed by the ultimate authority, the Supreme Court of the United States."

The minority opinion cited the American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360, and Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 128, 66 L.Ed. 254, 27 A.L.R. 375; the majority did not.

Justice Fowler was forced to yield his conception because in Senn v. Tile Layers Protective Union, Local No. 5, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229, in an opinion by Justice Brandeis, the conduct of the Union was upheld, declared to be lawful and the Court said (page 864): "One has no constitutional right to a 'remedy' against the lawful conduct of another."

Truax v. Corrigan, supra, was held not to be applicable because in the Senn Case the picketing was declared to be lawful and in Truax v. Corrigan, supra, the picketing was held to be unlawful. A vigorous dissent by Justice Butler, concurred in by Justice Van Devanter, Justice McReynolds, and Justice Sutherland, in which it was insisted that the picketing was an unlawful invasion of the constitutional right of the employer. That the principles of Truax v. Corrigan, supra, were applicable and that the Union

should have been enjoined by injunctive decree.

So the question for our consideration is what is lawful and what is unlawful picketing and peaceful persuasion. This rests, not with the Courts, but the legislative bodies. It remains for the Courts to interpret that law in the light of all that has gone before. See, also, American Furniture Company v. I. B. of T. C. and H. of A. Chauffeurs, Teamsters and Helpers General Local No. 200 of Milwaukee et al., 222 Wis. 338, 268 N.W. 250, 106 A.L.R. 335.

The Norris-LaGuardia Act was before the Circuit Court of Appeals for the 7th Circuit in the United Electric Coal Companies v. Rice et al., 80 F.2d 1. In that case the employees of the complainant Coal Company called a strike. The Company thereafter negotiated with a union, consisting of its employees, and entered into a contract with this union governing wages, hours, and conditions of employment and a great number of its employees returned to work under the terms of that contract. Another union purported to represent employees, insisting that they were the proper bargaining unit and employed picketing, accompanied by violence, in order to compel the employer to recognize it as the bargaining agency or unit for its employees. A state of lawlessness, amounting to violence, resulted with which the law enforcement bodies were not competent, or were unwilling, to cope. The District Court refused to grant an injunction for the reason that a labor dispute existed within the meaning of the Norris-LaGuardia Act and that the complainant had not exercised every effort to compromise the dispute as further provided by the Norris-LaGuardia Act. The Circuit Court of Appeals reversed the lower court and instructed the lower court to grant an injunction on the grounds that no labor dispute existed within the meaning of the Norris-LaGuardia Act because the complainant company had negotiated with its employees, had entered into a contract concerning wages, hours, and working conditions and that no labor dispute existed; that the complainant company was an innocent third party; that it had met all the requirements of the law and was therefore entitled to the remedial jurisdiction of the Court of Equity. Certiorari by the Supreme Court of the United States was denied, 297 U.S. 714, 56 S.Ct. 590, 80 L.Ed. 1000. It is significant to note that the Circuit Court of Appeals held that a labor dis-

pute, as defined by the Norris-LaGuardia Act, contemplated "the existence of the relation of employer and employee." (Page 5.)

The Norris-LaGuardia Act was again before the same Circuit Court of Appeals in Lauf v. Shinner & Co., 82 F.2d 68. The District Court enjoined a labor union from picketing a business of the complainant in order. to compel him to unionize his shop. It appearing that there was no controversy between employer and employee concerning wages, hours, or conditions of employment; that none of the members of the respondent union were employees of the complainant and the District Court held that picketing was, therefore, unlawful under the Federal and State Statutes. Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115; St.Wis.1933, § 268.18' et seq. This case arose in the State of Wisconsin wherein the statutes of Wisconsin, cited above, were applicable and had heretofore been construed by the Supreme Court of the United States in Senn v. Tile Layers Protective Union, Local No. 5, supra. The Circuit Court of Appeals held: That the right of the employer to operate his business was a subjective right granted to him by the Constitution which the Courts should protect by injunction— citing Truax v. Corrigan, supra, and American Steel Foundries v. Tri-City Central Trades Council, supra, also citing in its opinion, United Electric Coal Companies v. Rice, supra, decided in the same term of Court.

The Supreme Court of the United States, in an opinion by Justice Roberts, decided February 28, 1938, Lauf v. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872, reversed the Circuit Court of Appeals and held that a labor dispute existed within the meaning of the Norris-LaGuardia Act and the Wisconsin Labor Code, supra, and that peaceful picketing of the Union was lawful and the Court said (page 582) : "We find nothing in the declarations of policy which narrows the definition of a labor dispute as found in the statutes. The rights of the parties and the jurisdiction of the federal courts are to be determined according to the express provisions applicable to labor disputes as so defined."

Justice Butler and Justice McReynolds dissented from the majority and expressed the view that no labor dispute existed within the meaning of the Norris-LaGuardia Act. That the employer, not having the right to interfere with his employees in their right of self-organization and association and they having their own association and being satisfied with wages, hours, and working conditions, the picketing by the Union in this case was an invasion of the constitutional rights of the employer and a proper subject of injunctive relief under the doctrine announced in Truax v. Corrigan, supra.

The Norris-LaGuardia Act, supra, was again before the Supreme Court of the United States in the case of the New Negro Alliance et al. v. Sanitary Grocery Co., 58 S.Ct. 703, 82 L.Ed. 1012, decided March 28, 1938. In an opinion written by Justice Roberts the Court held picketing conducted by the negro organization to induce an employer to give employment to negro employees in stores where only white persons were employed involved a labor dispute within the meaning of the Norris-LaGuardia Act and thus limited the injunctive powers of the Federal Courts of Appeals which had affirmed the decree by the District Court of Columbia which had held that no labor dispute existed within the meaning of the Norris-LaGuardia Act; did not involve terms and conditions of employment in the employers' business; was not within the Norris-LaGuardia Act because it was essentially a racial dispute. The Court, after translating and defining the Act, said (page 706) : "These definitions plainly embrace the controversy which gave rise to the instant suit and classify it as one arising out of a dispute defined as a labor dispute. They leave no doubt that the New Negro Alliance and the individual petitioners are, in contemplation of the [Norris-LaGuardia] act, persons interested in the dispute."

The Court further said:

"In the first place, the act does not concern itself with the background or the motives of the dispute. In the second place, the desire for fair and equitable conditions of employment on the part of persons of any race, color, or persuasion, and the removal of discriminations against them by reason of their race or religious beliefs is quite as important to those concerned as fairness and equity in terms and conditions of employment can be to trade or craft unions or any form of labor organization or association. * * *

"The legislative history of the act demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise

of jurisdiction by federal courts and to obviate the results of the judicial construction of that act. It was intended that peaceful and orderly dissemination of information by those defined as persons interested in a labor dispute concerning 'terms and conditions of employment' in an industry or a plant or a place of business should be lawful; that, short of fraud, breach of the peace, violence, or conduct otherwise unlawful, those having a direct or indirect interest in such terms and conditions of employment should be at liberty to advertise and disseminate facts and information with respect to terms and conditions of employment, and peacefully to persuade others to concur in their views respecting an employer's practices."

The Court said that the District Court erred in not complying with the provisions of the Act. Justice Butler and Justice McReynolds were of the opinion that a labor dispute within the meaning of the Norris-LaGuardia Act, supra, did not exist.

By this analogy, can it be said that it would be unlawful for the respondents herein to peacefully picket the complainant's place of business, if, in their opinion, as a labor organization, the complainant did not furnish sanitary drinking cups or soft cushions for the trucks used in the operation of its business.

A state of facts strikingly similar to the case under consideration was presented to a three judge court for the Western District of Missouri in the case of Donnelly Garment Co. v. International Ladies' Garment Workers' Union et al., D.C., 21 F.Supp. 807, in which all the questions of law here presented were raised and decided by that court in an opinion written by Circuit Judge Van Valkenburgh and concurred in by District Judge Reeves, Judge Otis, dissenting. The Court held that an employer having negotiated with a committee duly and regularly selected by its employees under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., concerning wages, hours, and conditions of employment and where there was no division existing among the employees concerning the application of the contract; that a Union not representing any of its employees or having been adjudicated under the provisions of the National Labor Relations Act as the proper bargaining Unit to negotiate with the employer, that the employer was entitled to an injunction against the said Labor Union enjoining and forbidding said Union from picketing complainant, the employer, in order to force said complainant to recognize it as the bargaining unit and to enter into a contract whereby it would employ only members of its Union. The majority opinion cited with approval, United Electric Coal Companies v. Rice, supra; Newton v. Laclede Steel Co., 7 Cir., 80 F.2d 636; Lauf v. Shinner & Co., supra, and distinguished this case from Senn v. Tile Layers Protective Union, Local No. 5, supra. The Court further cited in support of its conclusions, American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360, picketing in that case was accompanied and attended by violence and physical force; the court seemed to take that into consideration in its determination that the Norris-LaGuardia Act did not prevent injunctive relief. To that extent we are not concerned in the consideration of this case.

The Court said (page 814): "There is here presented no division of opinion among employees upon which could be based even a plausible or colorable right on the part of the defendants to act as bargaining representatives. But more than that, no such claim is in fact asserted. The frank objective is the unionization of plaintiffs as affiliates of the defendant union, thereby automatically unionizing the employees, in order that the control of this defendant union may be nationwide and all-embracing, and this in the face of the declared public policy invoked. It is unthinkable that the rejection of such a demand, as against the will of these employees, and in conflict with obligations freely entered into, can be tortured into the conception of a 'dispute' ".

The Court said that the Norris-LaGuardia Act had no application to the controversy there presented. Justice Reeves in a separate opinion thought that the Norris-LaGuardia Act was supplemented, if not modified, by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., approved July 5, 1935; that the latter Act contained a declaration of public policy practically the same as the Norris-LaGuardia Act and that public policy asserted the right of the individual laborer to enjoy freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment; that he should be free of interference, re-

straint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; that the employees of the Company exercised that right of self-organization and bargaining collectively through representatives of their own choosing; that it was a right vouchsafed to employees by the Norris-LaGuardia Act and a proper subject for equitable jurisdiction; that such right constituted an inalienable right guaranteed by the Constitution of the United States and by the National Labor Relations Act and that nothing contained in the Norris-LaGuardia Act could be construed to circumvent or limit that right.

The only difference in the Donnelly Garment Company Case, supra, and the case at bar may be found in the intervention of the employees' union in the same suit in order to invoke the equitable jurisdiction of the Court in their behalf. But Judge Otis took the contrary view, in which he analyzed in minute detail the provisions of the Norris-LaGuardia Act; reviewed its historical background in much the same manner as we have reviewed legislation leading up to it and in the light of all the cases heretofore decided construing Section 20 of the Clayton Act. The reports of the Committees that reported the Norris-LaGuardia Act to Congress and which Committee report had made reference to the Duplex Printing Press Co. v. Deering, supra, specifically stated that it was the intention of this Act to overcome the inhibitions set forth in that decision. He identifies Frankfurter of the Harvard Law School as the author of this Act and makes reference to his treatise on "The Labor Injunction," a book published and to which the Congressional Committee made repeated reference in its report to Congress and stated:

"Now we have at least a part of the background of the Norris-LaGuardia Act. And we know it was the purpose of Congress to prohibit outright and altogether injunctions in many labor disputes in which injunctions had been issued and to circumscribe and condition the issuance of injunctions in all labor disputes. And we know, also, that it was the purpose of Congress to so broaden (or, perhaps, to so clarify) the definition of a 'labor dispute' as that 'the limitation (i. e. upon injunctions) may not be whittled away by refined definitions of what persons are to be regarded as legitimately involved in labor disputes.' Most clearly do we understand that it was the purpose of Congress to make it absolutely certain that the concept that a dispute must be between employer and employees was to be removed completely from the definition of a labor dispute."

The purpose of Congress was effected in the elaborate definition of what constituted a labor dispute in that Section of the Norris-LaGuardia Act. 29 U.S.C.A. § 113, all inclusive.

Judge Otis points out what he considers to be the weakness in the Lauf v. Shinner & Co. Case, supra, and the United Electric Coal Companies v. Rice, supra. (This opinion was written before the Supreme Court had reversed the Circuit Court of Appeals in the Lauf v. Shinner & Co. Case.) He lays the facts in the case before him, along aside the statute (Norris-LaGuardia Act), and concluded with convincing clarity that the facts in the case before him constitute a labor dispute within the definition of the Norris-LaGuardia Act and points out significantly, insofar as the facts are analogous to the facts before us, that the term "Growing out of a labor dispute" contained in the first section of the Norris-LaGuardia Act was not taken into consideration by the writers in the case of United Electric Coal Companies v. Rice, supra, and the case of Lauf v. Shinner & Co., supra, and that they further did not take into consideration that provision of the Norris-LaGuardia Act, "Regardless of whether or not the disputants stand in the proximate relation of employer and employee."

The analyzation of the facts in the case before Judge Otis and the conclusion he reached is so convincing to me that I cannot escape the same conclusion in the case before us.

This brings us to the 3rd proposition urged by the complainant. That is, that the provisions of the National Labor Relations Act modified the Norris-LaGuardia Act to the extent that the complainant is entitled to invoke the equitable jurisdiction of this Court to give effect to the rights and privileges guaranteed by the provisions of that Act.

It is well to consider here, in view of our conclusions thus far reached, that the complainant stands before this Court an innocent victim, at least I can find no fault

in him. That he has complied with the provisions of the National Labor Relations Act pertaining to collective bargaining with representatives of his employees, duly selected by a Committee elected and appointed by them, is not disputed. That there is now a contract between them governing wages, hours and working conditions is not disputed. The good faith of that contract is questioned but there is no proof to support it. Two former employees have refused to accept the provisions of that contract and have elected to picket the place of business of their former employer in order to compel him to recognize the Union of which they are now members. (The respondent herein). Before or about the time of the execution of this contract a strike was called and all employees, included within the craft herein involved, discontinued their work. It cannot be said that a labor dispute did not exist at that time. After execution of the contract some of the employees returned to work but "growing out" of this dispute two of the complainant's employees continued on strike and continued to picket. They have called to their aid and assistance, members of a union to which they belong and it cannot be said that this union does not have an indirect interest in the wages, hours, and conditions of employment of the employees of the complainant company and it is not necessary that they shall stand in the proximate relation of employer and employee.

■ Did the National Labor Relation Act intend to modify or supercede the prohibitions of the Norris-LaGuardia Act and if so in what tribunal rests the remedy of this complainant. As before stated, it has done all required by the law and can do no more. It stands helpless and it is difficult to understand and still more difficult to say that it is without remedy in this Court. We have been taught that for every wrong there is a remedy and that equity would redress that wrong where no adequate remedy at law is provided. The Courts are the creatures of the statutes. They derive their powers and limitations from the statutes which created them. Their power, whether as Courts of law or equity, may be limited and circumscribed by statute. Kline v. Burke Const. Co., 260 U.S. 226, 234, 43 S.Ct. 79, 82, 67 L.Ed. 226, 24 A.L. R. 1077; Turner v. Bank of North America, 4 Dall. 8, 10, 1 L.Ed. 718; United States v. Hudson, 7 Cranch 32, 3 L.Ed. 259; Shel-don v. Sill, 8 How. 441, 12 L.Ed. 1147; Stevenson v. Fain, 195 U.S. 165, 25 S.Ct. 6, 49 L.Ed. 142. Courts do not make the law and they can only redress the wrongs of citizens where the remedy or the redress is provided by law.

■ The employer in this case stands without remedy unless it be here. He does not have the right to invoke the jurisdiction of the National Labor Relation Board, created by the National Labor Relation Act, to determine the proper bargaining unit for his employees. His employees are the respondents and they alone have that right. The employer must bargain with his employees when petitioned so to do but the National Labor Relation Board is expressly given the power to determine the proper unite with whom they shall bargain.

Let us briefly consider the history of the National Labor Relation Act. The Act is similar in principle to the Transportation Act of 1920 (chapter 91, 41 Stat. 456–499). This Act provided for the settlement of disputes of Railroad Companies engaged in Interstate Commerce and their employees and created the Railroad Labor Board, defining its functions and powers. There was previous legislation but it is not of moment here. Under the Transportation Act. of 1920 the Railroad Labor Board had jurisdiction to hear and decide a dispute over rules and working conditions upon the application of either side, when the parties have failed to agree upon a settlement. It further provided that any organization of employees directly interested in the dispute could include labor unions. The Board had further jurisdiction to decide who may represent employees in conferences in applying for hearings and for the making of rules in advance for ascertaining the will of the employees with ·reference to representation before the Board but the Board had no power to determine the legal rights or the obligations of the Railroad employers or employees or to protect or enforce them but it was left to public opinion to compel adherence to the award. Pennsylvania Railroad Company v. United States Railroad Labor Board et al., 261 U.S. 72, 43 S.Ct. 278, 67 L.Ed. 536. It was there held that the Courts of Equity had no jurisdiction to enjoin the procedure of the Board while acting within its statutory limits.

The Transportation Act, supra, was amended by the Railway Labor Act of May, 1926 (chapter 347, 44 Stat. 577; 45 U.S.C.A. §§ 151–163, inclusive). This Act further enlarged upon a plan for amicable adjustment and voluntary arbitration of disputes between common carriers and their employees and in addition thereto imposed certain definite obligations enforceable by judicial proceedings. Subdivision 3 of section 2, 45 U.S.C.A. § 152, subd. 3, also, Section 9, 45 U.S.C.A. § 159. It, also, fully protected the right of self-organization without interference, influence or coercion exercised by either party.

In Texas & New Orleans Railroad Company v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, the Supreme Court upheld the injunctive power of the Federal Courts to enforce certain provisions of the Act. Secs. 9 and 10, 45 U.S.C.A. §§ 159, 160. Chief Justice Hughes, speaking for the Court, said (page 432): "It is thus apparent that Congress, in the legislation of 1926, while elaborating a plan for amicable adjustments and voluntary arbitration of disputes between common carriers and their employees, thought it necessary to impose, and did impose, certain definite obligations enforceable by judicial proceedings. The question before us is whether a legal obligation of this sort is also to be found in the provisions of subdivision third of section 2 of the act (45 U.S.C.A. § 152, subd. Third) providing that, 'Representatives for the purposes of this Act, shall be designated by the respective parties * * * without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other.'"

Chief Justice Hughes was of the opinion that the major purpose of Congress in passing the Railway Labor Act was to provide legislation to prevent strikes. In this case it was held that an injunction would lie to restrain the railroad employer from organizing an association of employees to negotiate under the provisions of the Act after they had accepted the Railroad Brotherhood as the bargaining agent and representative of the Railway Clerks for the purpose of submitting their controversy to the Board for arbitration and decision. The Railway Labor Act of May 20, 1926, supra, was amended by the Act of June 21, 1934 (chapter 691, 48 Stat. 1185, 45 U.S.C.A. §§ 151–163). The amended Act created the National Mediation Board and gave to it all of the powers and functions heretofore imposed in the Railroad Labor Board by the original act. The amended Act compelled the railway employer to treat with the authorized representative of the employees.

In Virginian Railway Co. v. System Federation No. 40, Railway Employees Department of American Federation of Labor, 300 U.S. 515, 57 S.Ct. 592, 81 L. Ed. 789, the Court in an opinion by Justice Stone sustained the constitutionality of the Railway Labor Act as amended by the Act of June 21, 1934 and upheld a mandatory injunction of the lower court to compel the employer to treat with the "The Authorized Representative" of the employees Union after the organization had been determined by the National Mediation Board to be the proper bargaining unit. In that case it was contended that the injunctive decree was in violation of the Norris-LaGuardia Act. In disposing of this question the court said (page 607): "The evident purpose of this section, [sec. 9, Norris-LaGuardia Act, 29 U.S.C.A. § 109] as its history and context show, was not to preclude mandatory injunctions, but to forbid blanket injunctions against labor unions, which are usually prohibitory in form, and to confine the injunction to the particular acts complained of and found by the court. We deem it unnecessary to comment on other similar objections, except to say that they are based on strained and unnatural constructions of the words of the Norris-LaGuardia Act, and conflict with its declared purpose."

The Court further held that the general provisions of the Norris-LaGuardia Act did not intervene to render nugatory the provisions of the National Labor Relations Act, supra. The National Labor Relations Act is patterned somewhat after the Railways Act of 1934, and no doubt derives in principal all of its purposes from the former Act. Section 151, 29 U.S.C.A., contains a declaration of policy with reference to the purposes of collective bargaining, self-organization, designation of representatives, for the purpose of negotiating the terms and conditions of employment of labor for its mutual aid and protection.

Section 153 creates the National Labor Relation Board and provides for tenure of office and salaries, etc.

Section 157 declares the right of employees to self-organization and collective bargaining.

Section 158 defines unfair labor practices.

Section 159 provides for the designation of representatives of employees for the purpose of negotiating, bargaining and for determination of the proper unit by the Board and provides for the hearing, to be determined by the Board, for the purpose of determination of the proper bargaining unit.

Section 160 empowers the Board to prevent any person from engaging in any unfair labor practice (listed in Section 158) and states that this power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law or otherwise.

Subsection (e), § 160, provides for the manner in which the orders of the Board shall be enforced. It provides that the orders of the Board shall be enforced by certification to the Circuit Court of Appeals of competent jurisdiction and provides for review by the Circuit Court of Appeals under certain specified conditions.

Subsection (f) provides, among other things, that upon filing of the petition, the Court (Circuit Court) shall proceed in the same manner as in the case of an application of the Board under Subsection (e) and shall have the same exclusive jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper and in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board; and the findings of the Board as to the facts, if supported by evidence, shall in like manner be conclusive.

Subsection (h) provides that when granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying and enforcing as so modified or setting aside in whole or in part an order of the Board, as provided in this section, the jurisdiction of courts sitting in equity shall not be limited by sections 101 to 115 of this title. (Norris-LaGuardia Act.) In this section and this section alone is reference made to the provisions of the Norris-LaGuardia Act.

Under Subsection (e), the Circuit Court of Appeals is given exclusive jurisdiction to review and to modify and to enforce the orders of the Board and it has been held in numerous cases that the District Courts have no jurisdiction to restrain or review the orders of the National Labor Relation Board. Therefore, subsection (h) did not appear to confer any jurisdiction upon this court, sitting as a court in equity, which would have the effect of releasing or waiving the limitations imposed upon this Court by the Norris-LaGuardia Act.

After making all of the foregoing provisions and vesting in the National Labor Relation Board the exclusive power to administer the provisions of the Act, section 163 of the Act provides as follows: "Nothing in this chapter shall be construed so as to interfere with or impede or diminish in any way the right to stirke." This would seem to be plain, clear and unequivocal. This question was treated by Judge Nordbye in the case of Lund v. Woodenware Workers Union, D.C., 19 F.Supp. 607, when a similar question arose and held that whenever a situation requires relief because of the violation of the National Labor Relation Act making representatives selected by a majority of employees for collective bargaining the exclusive representatives of all employees in the unit involved, the National Labor Relations Board is vested with exclusive jurisdiction to affect the remedy, and no proceedings between employer and employee under such act are entitled to any protection by the court until some affirmative action has been taken by the Board.

Let us suppose that the Court granted an injunction to the complainant in this case, restraining the respondent Union from picketing his place of business or in any way interfering with the operation of his business by peaceful picketing or persuasion because he had bargained with a committee of his employees; had entered into a contract with them concerning wages, hours, and conditions of employment and that the contract was satisfactory to all parties and that under the provisions of the National Labor Relations Act the employees were granted their right of self-organization by representatives of their own choosing and this court did enforce that right, sitting as a court

of equity. Can it be said that it would not have the direct effect of interfering with or impeding or diminishing the right to strike. This conclusion seems to me to be unescapable. Let us suppose further that the employees having bargained with the company and having entered into a contract, invoked the jurisdiction of the National Labor Relation Board for the purpose of having that Board adjudge them to be the proper bargaining unit within the meaning and the purposes of the National Labor Relations Act and suppose further that the Board entered its order so decreeing them to be the exclusive bargaining unit for the employees of this company; under the provisions of the act above quoted, it would be the duty of the Board to certify to the appropriate Circuit Court of Appeals for the enforcement of that order. This Court would not have jurisdiction but the Circuit Court of Appeals, alone, would have exclusive jurisdiction to enforce that order. Although it is not necessary and I do not now decide that question, but it appears to me that the remedy is open to the employees to have their employment contract protected by appropriate designated jurisdiction not provided here.

It is, therefore, plain that this Court does not have jurisdiction to grant the relief prayed for. The petition of the plaintiff for an injunction insofar as it seeks to enjoin peaceful picketing and persuasion free from fraud or violence, is denied.

Respondents herein, by counsel, stated in open court that they had no objection to entry of a decree enjoining acts of fraud or violence and there is no question about the authority of this court to enter such decree. The evidence in this case was conclusive that there has been acts of fraud and violence committed. Representations and conduct on part of counsel, representing respondents in this case, indicate conclusively that they have no desire to foster or sponsor any such unlawful acts. However, in order to extend to the complainant the protection afforded by law, within the limits of the jurisdiction of this court, the respondents will be restrained from committing any acts of fraud or violence consistent with the views herein expressed and the parties are directed to submit to findings of fact and conclusions of law, not inconsistent with views herein expressed.